NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 231154-U

NO. 4-23-1154

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 4, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| DONALD R. MARTIN, | ) | No. 22CF637 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed defendant's convictions of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. The appellate court held: (1) although the doctrine of curative admissibility did not justify admitting a video recording of the victims disclosing to their babysitter that they were sexually abused by defendant, that error was harmless; (2) defendant did not demonstrate either plain error or ineffective assistance of counsel in connection with the admission of (a) unredacted video recordings of the victims' interviews at the Children's Advocacy Center or (b) seven clips taken from defendant's police interview; and (3) defense counsel did not provide ineffective assistance in connection with cross-examination, presenting evidence, and closing arguments.

¶ 2   Following a trial, a jury found defendant guilty of predatory criminal sexual assault

of a child (720 ILCS 5/11-1.40(a)(1) (West 2020)) and two counts of aggravated criminal sexual

abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2020)) (miscited in the indictment as subsection 11-

1.60(c)(2)(i)). The trial court sentenced defendant to a cumulative total of 20 years in prison.

Defendant appeals, raising multiple purported evidentiary errors and arguing that he received ineffective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            Count I of the indictment alleged that between January 1, 2020, and June 30, 2022, defendant committed the offense of predatory criminal sexual assault of a child in that he was older than 17 and placed his penis in the mouth of J.G., who was younger than 13. Count II alleged that during the same time frame, defendant committed the offense of aggravated criminal sexual abuse by fondling the penis of M.G., who was younger than 13. Count III alleged that during the same time frame, defendant committed the offense of aggravated criminal sexual abuse by having M.G. touch defendant's penis.

¶ 5                              A. Section 115-10 Hearing

¶ 6            Before trial, the State moved to introduce evidence pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2022)), which provides a hearsay exception under certain circumstances for out-of-court allegations of sexual assault or abuse made by victims under 13. Specifically, the State sought to introduce evidence regarding J.G.'s and M.G.'s disclosures to (1) their babysitter, Elanda Edwards, and (2) a child forensic interviewer, Sarah Lavin.

¶ 7            The trial court held an evidentiary hearing on this motion. The evidence showed that on June 30, 2022, Detective Allison Palmer of the Pekin Police Department received a report from the Illinois Department of Children and Family Services (DCFS) regarding suspected sexual abuse of three siblings: J.G., M.G., and I.G. (Ultimately, defendant was not charged with offenses against I.G., as she did not disclose being sexually abused.) Palmer arranged for J.G. and M.G. to be interviewed by Lavin at the Children's Advocacy Center (CAC) on July 6, 2022. On August

15, 2022, Palmer received from either Edwards or the children's stepmother a copy of a video recording in which the children were speaking with Edwards (Edwards recording). The Edwards recording was made at some point before the CAC interviews, and that recording led to the DCFS and police investigations in June 2022.

¶ 8 In connection with the section 115-10 hearing, the trial court reviewed three video recordings: (1) the Edwards recording, (2) J.G.'s interview at the CAC, and (3) M.G.'s interview at the CAC.

¶ 9 1. *The Edwards Recording*

¶ 10 The version of the Edwards recording in the record on appeal is shorter than the one the trial court reviewed in connection with the section 115-10 hearing. The version in the record contains only the portion of the recording that was ultimately introduced at trial, which runs 3 minutes and 56 seconds. (At trial, the jury did not see the other portions of the Edwards recording, in which Edwards had a discussion with I.G.)

¶ 11 The recording began with J.G. and M.G. sitting on a couch. Half of J.G.'s body was out of the video frame. M.G. remained sitting throughout the video, but J.G. was sometimes out of view of the camera. I.G. also appeared on camera at various points but did not say anything.

¶ 12 Edwards began by mentioning "what we talked about" and told the children there were good secrets and bad secrets. Edwards asked the name of the man they had been talking about. M.G. responded, "You can just call him Don." J.G. said, "Donnie." (At trial, the children identified defendant as Donnie.) Edwards told the children to be honest. She added that she did not really get a good understanding when they were talking earlier, as her "heart was hurting so bad."

¶ 13    Edwards asked J.G. to show her on a teddy bear what defendant did to him. Edwards added that J.G. did not have to be scared and would not get his "head punched in." J.G. walked out of view of the camera and said something indiscernible. Edwards asked J.G. what else defendant did to him that he did not like. Still out of view of the camera, J.G. said something else that was indiscernible. Edwards asked J.G. whether "all you guys" used to be there when defendant did that. J.G. responded, "Nope, just me." M.G. interjected, "Just one time, I think. No, one other time, yeah." Edwards asked, "So he never did all y'all together?" M.G. shook his head. Still out of view of the camera, J.G. then said, "He put his private in my mouth." Edwards asked what J.G. told her defendant would do to his head. J.G. responded, "He'll smash it into a door." Edwards asked, "If you tell somebody?" J.G. responded by saying something indiscernible.

¶ 14    Edwards then asked M.G. what happened. Evidently referencing "Donnie," M.G. said, "he would spit spitwads at us." Edwards asked M.G. to demonstrate on a teddy bear the things he did not like. M.G. explained that I.G. was in her room and J.G. and M.G. were in their room, and then "he" called one of them. M.G. added, "and then he," before trailing off. Edwards told M.G. it was okay and that he did not have to cry and was not in trouble. J.G. interjected that "he" put them in the corner for no reason. Edwards told M.G. he did not have to cry and that nobody was going to do anything to him. Pointing to the crotch of the teddy bear and then pushing on the back of his own head, M.G. said, "he used to do our heads and then went here to our mouth."

¶ 15    *2. J.G.'s CAC Interview*

¶ 16    The following is a summary of the salient portions of J.G.'s interview with Lavin at the CAC on July 6, 2022.

¶ 17    J.G. said he was five years old and was entering first grade. Lavin asked J.G. what brought everybody here today. J.G. responded that there was "this guy" who beat them, kicked

their legs, and threatened to slam their father's head into a door if they told somebody. J.G. added that this person was mean to them and their father. J.G. said this person would "whoop" them if they told. Asked who he was talking about, J.G. responded that "Donnie" would do everything bad to them.

¶ 18 Lavin questioned J.G. using an anatomical diagram of a male body. J.G. circled the entire back side and said that defendant "whoops" them on the "butt." Asked whether anything else ever happened to any other part of his body, J.G. responded in the negative. However, when asked whether anybody ever made him do anything to any part of their body, J.G. nodded his head in the affirmative. Referring to a "private" and a "popsicle" while making a gesture indicative of oral sex on a male, J.G. added, "He makes us do that." Asked to circle the area of the diagram he was referencing, J.G. circled the genital area. J.G. nodded his head in the affirmative when Lavin asked whether defendant made him "do like you do with a popsicle." Asked what defendant was doing when this happened, J.G. responded that defendant said he would ground them their whole lives until they were 100. J.G. said his mother was at work when this happened and that it occurred in defendant's room. This happened more than one time, and it was always in defendant's room. J.G. said he had seen M.G. have to do "the same thing" to defendant.

¶ 19 Lavin attempted to elicit information as to whether defendant sexually abused other children. J.G.'s responses were unclear. He seemed to suggest that he had peeked out of a closet and seen defendant abusing unnamed friends, neighbors, or classmates of J.G. However, asked how he knew those people, he said he "made them in my mind."

¶ 20                 3. *M.G.'s CAC Interview*

¶ 21 The following is a summary of the salient portions of M.G.'s interview with Lavin at the CAC on July 6, 2022.

¶ 22 M.G. said he was seven years old and entering second grade. His brother, J.G., was five years old, and his sister, I.G., was three or four. M.G. did not like his mother because she was mean to them and "whooped" them on the butt with a pan or a belt. M.G. no longer stayed at his mother's house.

¶ 23 Pointing to his crotch, M.G. told Lavin that defendant had touched him, his sister, and his brother in the "privates." However, M.G. clarified he did not personally see defendant sexually abuse either J.G. or I.G. M.G. circled the genitals on a diagram of a male body. M.G. said this touching occurred with Donnie's hand and felt uncomfortable. The touching was over M.G.'s clothes, never under. M.G. said that he also had to touch defendant in the same spot with his hand— under defendant's clothes but over the underwear. Defendant threatened to smash M.G.'s brain if he told anybody. M.G. said this happened one time "a long time ago" at a house in Pekin, where he used to live. He thought he was either in preschool or kindergarten when it happened. M.G. did not remember in which room of the house the touching occurred. M.G. said he thought his mother was at work when it happened.

¶ 24 4. *Arguments and Rulings Regarding Section 115-10 Statements*

¶ 25 Defense counsel initially indicated he "really [didn't] have any objection" to the State introducing the recordings of J.G.'s and M.G.'s interviews at the CAC. Counsel conceded that those interviews where "done in a proper manner" and there was "no bias" on the part of Lavin. However, defense counsel subsequently noted that I.G. was mentioned during those interviews, whom defendant had not been charged with abusing. The prosecutor responded that defense counsel had previously told her he wanted the CAC videos played in their entirety, with no edits. The trial court recalled that there was no reference in the CAC interviews to I.G. being molested. The prosecutor responded that there were "questions about it" during the CAC

interviews but that I.G. did not disclose being sexually abused. The court ruled that it would allow the CAC interviews to be played, as there was nothing "overly prejudicial" in them. After the court ruled, defense counsel reiterated he would like to have any mention of I.G. removed from the two CAC interviews. The court responded that the State was "free to do that if they want to," but that based on the court's memory of the videos, there was nothing prejudicial.

¶ 26    Defense counsel objected to the State introducing the Edwards recording, essentially arguing this evidence lacked sufficient safeguards of reliability. See 725 ILCS 5/115-10(b)(1) (West 2022) (providing that to admit a child's hearsay statement, the trial court must find, *inter alia*, that "the time, content, and circumstances of the statement provide sufficient safeguards of reliability"). The trial court denied the State's motion to introduce evidence regarding the Edwards recording. Among the court's concerns were that Edwards asked leading questions of J.G. and M.G. and the sound quality was poor at times.

¶ 27    B. Juvenile Court Records

¶ 28    Defense counsel indicated he wanted to introduce at trial an August 28, 2020, order entered in a juvenile court proceeding that prohibited defendant from contacting either J.G. or M.G. Counsel's proffered reason for admitting this evidence was that because defendant did not have any contact with J.G. or M.G. after this order was entered, defendant could not have committed the charged acts during the majority of the time frame alleged in the indictment (January 1, 2020, through June 30, 2022). Over the State's objection that it was improper to introduce juvenile court records, the trial court allowed defendant to introduce evidence regarding the August 28, 2020, order.

¶ 29    C. Trial

¶ 30    1. *The State's Case-In-Chief*

- 7 -

¶ 31                                    a. M.G.

¶ 32          At the time of trial, M.G. was eight years old and in third grade. He lived with his father, his "mom" (his stepmother), J.G., and I.G. M.G. testified that he previously felt unsafe when he lived with his "mommy" (his biological mother) in Pekin because of her boyfriend, Donnie. M.G. identified defendant in court as Donnie. According to M.G., defendant "made me suck his pee pee," which is "[a] private." Defendant's hand also touched M.G.'s "pee pee" or "private" under his clothes. However, M.G.'s hand never had to touch any part of defendant's body. M.G. testified that defendant touched his "pee pee" when they were alone in his "[m]ommy and daddy's room" (presumably, the room M.G.'s mother shared with defendant). Defendant asked him not to say anything. However, at some point after he lived with defendant, M.G. told his father and "Aunt Sara." M.G.'s father and babysitter told M.G. to tell the truth.

¶ 33          On cross-examination, M.G. testified he did not know how many times defendant touched him. M.G. did not know the time of day, the month, or the year when the abuse occurred. He recalled that he attended school in Pekin at the time, but he did not know which school. M.G. did not remember what his house in Pekin looked like, other than that he thought it was blue. He did not know how long he had lived at the Pekin house. He did not know how many bedrooms that house had, but he remembered sharing a bedroom with J.G. and I.G. M.G. believed, but did not know, that his mother was at work when defendant touched him. M.G. did not know where J.G. and I.G. were when this happened, but he believed they were at home. M.G. believed the abuse lasted until he was five years old, "[u]ntil my daddy got me, I think" (*i.e.*, until he went to live with his father). M.G. believed that he was five years old when he told his father and babysitter about what happened.

¶ 34 On redirect examination, M.G. testified he believed defendant touched his "pee pee" one time. M.G. believed that defendant had asked him to go to the bedroom.

¶ 35 b. J.G.

¶ 36 At the time of trial, J.G. was six years old and in first grade. He now lived in El Paso, Illinois with his "dad and [his] mom" (his stepmother). Donnie, whom he identified in court as defendant, made him feel unsafe when they lived in Pekin with his mother and siblings. Specifically, in J.G.'s mother's bedroom, defendant made J.G. "suck his pee pee," which is the "front part" used for going to the bathroom. J.G. was three years old when he lived in a house with his mother and defendant. According to J.G., he would watch television in his mother's bedroom and defendant would lock the door. Defendant told him he was not allowed to tell anyone. However, J.G. told his father, who told him to tell the truth.

¶ 37 On cross-examination, J.G. testified that he had spoken to the assistant state's attorney multiple times before trial. According to J.G., M.G. and I.G. were waiting outside the door to their mother's bedroom when the events with defendant occurred. J.G. then testified that M.G. and I.G. were in the bedroom with him and that they tried to run away but the door was already locked. J.G. testified that his mother was at work and M.G. and I.G. were standing by the door, afraid to watch or get near defendant. J.G. recalled that he was three years old and not attending school when this happened. M.G., however, was attending school. Specifically, on the day this happened, M.G. came home from school and defendant brought M.G. "into the room." This occurred during the daytime.

¶ 38 J.G. further testified on cross-examination that the house in Pekin where this occurred was blue. He did not know how many bedrooms it had. However, he remembered he

shared a room with M.G. and I.G. He also remembered there was a closet in that room that could not be locked.

¶ 39 Also on cross-examination, J.G. testified he did not remember saying during an interview on July 6, 2022, that defendant did bad things to his classmates. J.G. added, "He didn't do anything to our classmates." Asked "who have you seen that Donnie has touched improperly," J.G. responded, "My brother and my sister." J.G. said he had not seen defendant touch anyone else inappropriately. J.G. testified that he told his father what had happened "[t]he day after that happened." However, through subsequent questioning, it became clear J.G. did not know when he told his father about the abuse, other than that it was in August of a year he did not recall.

¶ 40                                                    c. Jeremy G.

¶ 41 Jeremy G.—the father of M.G., J.G., and I.G.—testified as follows. Makenna C. is the mother of the children. Prior to some date in August 2020 that Jeremy did not remember, the children lived in a couple different places with Makenna and defendant. In August 2020, the three children came to live with him and his girlfriend full-time. They now lived in El Paso, Illinois. Since August 2020, the children never lived with defendant.

¶ 42 On cross-examination, in a portion of an answer that was not directly responsive to the question that was asked, Jeremy mentioned an "abuse case" in August 2020. After a sidebar conference, and outside the presence of the jury, the trial court instructed Jeremy not to mention "any physical abuse allegations or why the kids would have been taken into shelter care in August." When Jeremy continued his cross-examination, he testified that he obtained custody and guardianship of his children in August 2020. Since August 2020, Makenna had seen the children, but Jeremy had not allowed M.G. or J.G. to have physical contact with defendant. Jeremy took M.G. and J.G. to be interviewed at the CAC and to speak with the assistant state's attorney.

¶ 43                                    d. Lavin

¶ 44          Lavin, a certified forensic interviewer and the executive director of the CAC, testified about interviewing J.G. and M.G. on July 6, 2022. When the State moved to admit the recordings of these interviews into evidence, defense counsel said: "I agree to not object, but I made a earlier [*sic*] objection. I still hold that one which I told to the Court." The trial court allowed the State to play the two CAC interviews in their entirety for the jury.

¶ 45                                 e. Kevin Pfeifer

¶ 46          Kevin Pfeifer, an employee of DCFS, testified that he was involved with a case pertaining to J.G. and M.G. in August 2020. Prior to August 2020, and during the beginning of that month, J.G. and M.G. lived with Makenna and defendant. On August 26, 2020, Pfeifer took custody of J.G. and M.G., and they went to live with Jeremy. Pfeifer had no information as to whether defendant had contact with J.G. or M.G. after August 26, 2020.

¶ 47                                   f. Mark Smith

¶ 48          Officer Mark Smith of the Pekin Police Department testified that on either August 23 or 26, 2020, he assisted DCFS with taking custody of the children at an address on 11th Street.

¶ 49                                     g. Palmer

¶ 50          Palmer, a detective with the Pekin Police Department, testified she primarily handled investigations involving child victims and sex crimes. On June 30, 2022, DCFS and the El Paso Police Department referred to her a case involving J.G. and M.G. disclosing sexual abuse to their babysitter, including "molestation" and "oral penetration." Palmer contacted the DCFS worker and Jeremy to arrange for J.G. and M.G. to be interviewed at the CAC. Palmer observed the children's interviews at the CAC on July 6, 2022. She noticed that M.G. was nervous during his interview, that it was difficult for him to talk about sexual abuse, and that it "affected" him

when Lavin began to discuss the abuse. Over defense counsel's objection, Palmer testified that as a trained child forensic interviewer herself, this was significant to her because the demeanor of a victim "can show credibility of a statement." Palmer likewise noted that J.G. seemed nervous and a little fidgety during his interview, was "very graphic," and "answer[ed] questions appropriately when asked about sexual abuse." After the interviews at the CAC, Palmer canvased J.G.'s and M.G.'s former neighborhood to follow up on J.G.'s comment that "Donnie" had abused other children. Palmer was unable to identify any other child who had been abused.

¶ 51    Palmer ascertained that defendant was "Donnie" and was dating the children's mother. Defendant agreed to be interviewed at the Pekin police station on September 9, 2022. Detective Andrew Thompson assisted Palmer with this interview. Palmer testified that defendant never directly admitted to committing sexual acts against J.G. and M.G.

¶ 52    The full recording of defendant's police interview was 1 hour and 41 minutes long. The prosecutor did not attempt to play the entire recording for the jury. During a sidebar, the prosecutor acknowledged that large portions of this interview were irrelevant and inadmissible, including discussions about (1) defendant physically abusing J.G., M.G., and I.G., (2) past molestation in defendant's home, and (3) defendant's juvenile adjudication for a child pornography offense. Thus, the prosecutor sought to play only seven clips from defendant's interview. Defense counsel objected to these clips on bases that defendant does not reiterate on appeal. During the discussions regarding defense counsel's objections, the prosecutor and the trial court offered defense counsel the opportunity to admit any additional portions of defendant's interview that counsel thought provided context to defendant's answers in these clips. Defense counsel requested only that the State lengthen the seventh clip. The court ultimately overruled that

request because the additional discussion referenced inadmissible evidence and did not provide context.

¶ 53       When Palmer resumed her testimony, the State played for the jury the seven clips from defendant's interview. The first clip was two minutes long. In this clip, Palmer mentioned that the children were not "making up stuff" and that their allegations were "coming from memory." Thompson added: "And I think that they have named you because something happened, and just to be totally honest with you, okay." Thompson encouraged defendant to be honest. Thompson said he thought defendant was a guy who "maybe made a mistake" "expressing love," and that "we just need to get past that mistake." Thompson asked if that was what was going on, and defendant responded, "Yeah, pretty much." Thompson then asked defendant to tell him and Palmer what happened. Defendant then said the only time he was ever around "the kids naked" was when they showered. He said he stayed fully clothed while washing them.

¶ 54       The second clip was 39 seconds long. In this clip, defendant said that children sometimes lie. Thompson responded that children do not lie about things like putting penises in mouths or inappropriate touching, because they do not understand it. Defendant said, "Right." Palmer then brought up that defendant's sister and mother had "experienced this kind of stuff" and did not lie about it. Defendant responded, "Right."

¶ 55       The third clip was 4 minutes and 50 seconds long. Palmer began by saying she felt J.G. and M.G. were being honest because they were consistent in their allegations. Palmer said she was trying to figure out whether defendant "showed love a little too much and it went too—you know, one direction." Defendant responded, "I mean, it probably could have, to be honest with you." Thompson asked defendant to tell them exactly what happened with the kids. Before defendant answered that question, Thompson said, "We know it happened. The kids aren't lying."

- 13 -

Thompson then asked defendant to tell him about the time he touched one of the kids inappropriately. Defendant said, "I mean, the only time I ever touched them was in the shower." Defendant denied touching them outside of the shower. Palmer asked defendant what he meant by agreeing that he showed love a little too far. Rather than allowing defendant to answer that question, Thompson and Palmer talked about how children do not lie, while defendant periodically said, "Right." Defendant then said he used to roughhouse with the children and take them everywhere. He said he never touched them inappropriately, "besides from giving them a bath." When Thompson asked defendant what he meant by this, defendant said he helped the children wash. Thompson asked defendant whether he was talking about pulling the children's foreskin back to wash it. Defendant responded, "Right." Thomspon asked defendant whether he would consider that appropriate or inappropriate. Defendant responded: "I mean to most people, probably. But to me, I'm just, you know—." Defendant then said he "pulled it back, and cleaned it, and then let it go." Palmer noted that the children were "super duper consistent" that the behavior happened in a bedroom, not a bathroom. Defendant said he had been told it had "happened in the living room." Palmer told defendant that he had received inaccurate information about the children's accusations. Defendant questioned whether I.G. was making allegations against him, too. Palmer explained that I.G. just talked about "getting spanked on the butt." Defendant admitted to spanking I.G. Defendant said the only time he was in the children's bedroom was to get them dressed and to bed. Defendant said he always stayed in his room, playing video games and watching television. He said he barely ever left Makenna's side. He said the only time he was home alone with the children was when Makenna was at work. Asked what he did when he was alone with the children, he said he would lie on the couch, smoke cigarettes, and drink soda while the children watched television, wrestled, or played.

¶ 56　　　　The fourth clip was 56 seconds. In this clip, Palmer explained that the children "said the same kind of things over and over again," but they loved defendant and were not trying to take him down. Defendant responded that he believed something like this happened, but he did not "think it came from" him. Thomspon asked, "You don't think?" Defendant clarified he knew it did not come from him. Defendant said he was confused why these things were coming up when he had not seen the children in two years. Thomspon then talked about delayed disclosure among abuse victims.

¶ 57　　　　The fifth clip was 1 minute and 25 seconds. In this clip, Palmer explained that defendant had gotten "fifth party information" about the children's accusations, whereas she knew the children's accusations and believed what they said. Defendant said he was "staying with my story because I'm telling the truth." He said he was rarely home unless he had to be there to watch the children while Makenna was at work.

¶ 58　　　　The sixth clip was 36 seconds. In this clip, defendant said he had witnesses who would attest that he was barely ever home. However, defendant then acknowledged that he had been home alone with the children when Makenna worked. Palmer told defendant that it was during those times that the children were saying this happened. Defendant said he did not "remember this ever happening" and that "if it happened, then I don't remember it." Palmer asked defendant whether he thought he "could have, like, blocked it out." The clip ended without defendant answering that question.

¶ 59　　　　The seventh clip was 1 minute and 43 seconds long. In this clip, Palmer talked about how the children still cared about defendant. As the interview concluded, Thompson thanked defendant for talking to him and Palmer. Defendant apologized in case he had been stubborn. Thompson said defendant had not been stubborn. Thompson asked whether defendant had any

questions before they got him out of there. Defendant asked: "The one—like, okay, say you know. Say I did do it. Okay. Let's just say I did it. What happens?" The clip then ended.

¶ 60    Continuing her direct examination, Palmer testified that she reviewed DCFS reports to determine the location and timeline relating to this case. Palmer testified that J.G. and M.G. had lived at an address on 11th Street in Pekin with Makenna and defendant. Palmer learned that the children were removed from that home on August 26, 2020. Palmer had no information that the children ever had contact with defendant after that date.

¶ 61    On cross-examination, defense counsel questioned Palmer about how she became involved in the investigation. Palmer explained that J.G. and M.G. made disclosures to Edwards, who informed Jeremy. That information was then reported to the El Paso Police Department on June 18, 2022, before ultimately being referred to the Pekin Police Department by DCFS based on the belief that the events had occurred in Pekin. Presumably referencing the date when J.G. and M.G. made their disclosures to Edwards, Palmer testified that she believed this all "came to light" on June 18, 2022. Asked whether she knew what that incident was about, Palmer responded that the children made an outcry of abuse to Edwards. Counsel followed up, "Well it was something with a teddy bear; is that correct?" Palmer responded that "[t]he babysitter had used a teddy bear during her questioning of the children." Counsel asked, "And that was what her complaint was about, wasn't it?" Palmer responded in the affirmative.

¶ 62    On cross-examination, Palmer further testified that after the CAC interviews on July 6, 2022, she reviewed medical and DCFS records and spoke with Edwards, defendant, and a DCFS worker. Makenna was unwilling to submit to an interview with Palmer. Palmer acknowledged that she never identified a specific date or time when the charged conduct occurred. According to Palmer, in his interview, defendant initially said he had moved in with Makenna and

the children in June 2020, but he later said that occurred in February 2020. Defendant also told Palmer that his last contact with the children was on August 26, 2020. Defense counsel questioned Palmer about why she did not investigate people who were involved in the children's lives after August 26, 2020. Palmer explained that she focused her investigation based on the children accusing defendant and the information that defendant did not see the children after August 26, 2020.

¶ 63 Palmer further testified on cross-examination that she investigated J.G.'s comments during his interview at the CAC about defendant sexually abusing other friends or classmates. Palmer canvassed the children's old neighborhood by going door-to-door to speak with residents about that. She never identified other children who might have been sexually abused. Palmer concluded that either families had moved out of the area or J.G. had merely been referencing imaginary friends in his CAC interview. Palmer acknowledged she did not attempt to question J.G. about the names of other children defendant supposedly abused, as she was "not trained to bring back a child's memory."

¶ 64 Defense counsel also asked Palmer whether, during the CAC interview, Lavin used the phrase " 'lick it like a ice cream cone' " before J.G. used that phrase. Palmer responded that J.G. "said those words first." Defense counsel asked, "You certain of that?" Palmer said she was certain. Counsel asked, "So you're saying he came up with the words totally himself, the boy did?" Palmer responded, "He used the word 'popsicle.' "

¶ 65 On redirect examination, the prosecutor questioned Palmer briefly about Edwards:

> "Q. [Defense counsel] asked you specifically about disclosures that were made to Elanda Edwards. Do you recall that?
>
> A. Yes.

Q. Were you able to speak with Elanda Edwards about the disclosures that were made to her?

A. Yes.

Q. And any actions [defense counsel] asked you about?

A. Yes.

Q. Were those consistent with your investigation?

A. They were consistent."

¶ 66     On further cross-examination, defense counsel questioned Palmer as follows:

"Q. Okay. You just said that in talking with the babysitter, her—what she—information she gave you was consistent; is that correct?

A. That is correct.

Q. What was consistent?

A. The boys disclosed to the babysitter that [defendant] had touched their penis.

Q. That [defendant] had touched their penis?

A. Yes, had made contact with their penis.

Q. Okay. And did they say how?

A. They—they used a teddy bear and said that he would touch—they used the teddy bear as, like, a demonstrating model and she asked where on their body [defendant] would touch and they touched the groin area of the teddy bear.

Q. So that made it consistent, correct?

A. They were consistent—

Q. Is that what you're referring to?

A. They were consistent saying who touched where on their bodies."

¶ 67    At the conclusion of defense counsel's additional cross-examination of Palmer, the prosecutor requested permission to publish the Edwards recording to the jury as substantive evidence because defense counsel had opened the door through his questioning of Palmer. As part of her argument, the prosecutor recalled (incorrectly) that defense counsel had "mentioned that there was in fact a video recording of this conversation." From this incorrect belief, the prosecutor reasoned that it would be prejudicial to the State not to play the portion of the Edwards recording where J.G. and M.G. made their disclosures. As her secondary request, the prosecutor asked for the defense to be barred from arguing "anything about any missing evidence about this conversation or the video not being presented to the jury."

¶ 68    In response to the prosecution's requests, defense counsel maintained that he had merely followed up with Palmer after the State questioned her about the children's disclosures to Edwards being "consistent." Defense counsel further challenged the State's ability to lay the foundation for admitting the Edwards recording into evidence. Defense counsel represented that he would not argue to the jury that the State failed to present evidence.

¶ 69    The trial court mentioned multiple times that defense counsel had used the word "video" when questioning Edwards. The court ruled that, subject to the State laying a foundation, the defense had opened the door to the State playing for the jury 3 minutes and 56 seconds of the Edwards video. (The prosecutor agreed not to play the remaining approximately six minutes of the video, which apparently included Edwards questioning I.G. about abuse.) However, the court ruled this evidence would be admitted "for the limited purpose of explaining the officer's course of conduct in [the] investigation."

¶ 70        On further redirect examination, Palmer testified as follows to lay the foundation for admitting the Edwards recording. Palmer was aware of a "video recording related to this outcry incident." (This was the first time the jury heard that the children's disclosures to Edwards had been recorded.) Palmer became aware of the Edwards recording because the initial police report she received "noted that the outcry witness was the babysitter who relayed that information to the parents." As part of her investigation, Palmer then spoke with Edwards. Edwards told Palmer that, while speaking with the children, she "realized she should probably record this and had set up her cellphone to record the kids." Edwards told Palmer that she "sent that recording to the children's stepmother" the same day it was recorded, on June 17, 2020. Palmer added, "It's noted in the El Paso Police Department [report] that according to Janene, the stepmother, that the video was taken when she went to go pick up the kids on the 17th." Palmer received this video through a secured link using the "Axon evidence system." Palmer identified People's exhibit No. 8 (later corrected to People's exhibit No. 7) as "a disc containing the video from the babysitter." Palmer testified that the contents of this exhibit "fairly and accurately depict the video recording that [she] received pursuant to this investigation." She added that it was the "same video content" she had relied on during her investigation.

¶ 71        The trial court allowed the State to admit this exhibit into evidence and gave the jury the following limiting instruction:

> "This video is being admitted for the limited purpose of explaining the officer's course of conducts [*sic*] in the steps that she has taken in—in relying on this video in her investigation and it's not to be considered by you for any other purpose in this case, okay? So just to consider it for the limited purpose of the officer's course

of conduct, the steps she's taken in her investigation in relying upon this video, all right?"

The State then played the 3 minute and 56 version of the Edwards recording for the jury. Palmer identified J.G. and M.G. on this video. Palmer testified that this accurately reflected the recording she received.

¶ 72          On further cross-examination, Palmer testified that she did not know the specific date when she received the Edwards recording.

¶ 73                              h. Thompson

¶ 74          Thompson testified that he is a detective with the Pekin Police Department. When interviewing a suspect, he typically tries to build rapport and determine which tactics to use. Some tactics he uses when interviewing suspects in child sexual abuse cases include blaming or shaming the victim, minimizing the allegations, and asking narrative questions to elicit more detailed responses. Thompson testified that he and Palmer interviewed defendant using such techniques.

¶ 75          On cross-examination, Thompson testified that he did not interview anyone other than defendant in connection with this case. Palmer was the lead detective who asked defendant most of the questions, so Thompson did not believe it was important to question defendant about the dates and times when the allegations occurred.

¶ 76                      2. *Defendant's Case-In-Chief*

¶ 77          Defendant presented five witnesses on his own behalf.

¶ 78                              a. Christy Harris

¶ 79          Defendant's first witness was his mother, Christy Harris. She testified that she met Makenna, M.G., J.G., and I.G. in June 2019. Makenna and the children lived in an apartment across the hall from where Harris lived with her husband. On December 17, 2019, defendant moved into

Harris's apartment and met Makenna. Defendant started dating Makenna on March 4, 2020, and he met Makenna's children for the first time on March 8, 2020. Shortly thereafter, defendant stayed at Makenna's apartment until they had a falling out later that month. Defendant and Makenna got back together on April 1, 2020, and defendant stayed at Makenna's apartment almost that whole month. Harris saw Makenna's children almost every day and would babysit them if they were sick and Makenna was working. Harris recalled that after April 1, 2020, she babysat the children only "four times when they were sick." This was from 8 a.m. until 4:30 or 5 p.m., when "[m]om was at work." Other than day care, Harris was the only babysitter for the children. However, Harris later said that her husband was the children's backup babysitter.

¶ 80          Harris testified that during May 2020, defendant alternated time between Makenna's apartment and Harris's apartment. Without further explanation, Harris then testified that defendant was "no longer there" (at this apartment complex) for "the remainder of May."

¶ 81          On June 15, 2020, defendant and Makenna moved to a blue house on 11th Street. Harris went to that house four or five times each week to spend time with defendant and the children. Harris would sometimes spend nights there. In July 2020, Harris had a lot of contact with defendant, but not with Makenna's children.

¶ 82          In August 2020, Harris babysat Makenna's children once when they were sick, and Harris saw the children three times each week. Harris was aware that defendant babysat Makenna's children on August 24, 25, and 26, 2020, while Makenna was at work. Those were the only times Harris was ever aware that defendant was alone with Makenna's children. According to Harris, defendant did not feel very comfortable watching the children alone, so he Facetimed Harris for three hours on August 24, two and a half hours on August 25, and five hours on August 26. Harris

testified that there were no times on those three dates that defendant was with the children and was not Facetiming her.

¶ 83    On cross-examination, Harris testified she was not aware that defendant (1) told the police he moved in with Makenna in February 2020, (2) told the police he had been alone with Makenna's children while babysitting them when Makenna worked, and (3) neglected to tell the police that he communicated with Harris while babysitting the children. Harris acknowledged that the house in Pekin on 11th Street was not close to her apartment and that she was not always present at the 11th Street residence.

¶ 84                              b. Makenna

¶ 85    Makenna testified that she previously lived with her children in an apartment across the hall from Harris. Makenna met defendant on December 17, 2019. In the second week of February 2020, she exchanged phone numbers with defendant and started to see him more frequently. At that time, M.G. was five, J.G. was almost three, and I.G. was almost two. Makenna introduced her children to defendant in February 2020. Makenna and defendant started dating on March 4, 2020. Defendant was not alone with the children in either February or March 2020. Defendant continued to live at Harris's apartment, and Makenna and defendant did not move in together until June.

¶ 86    On June 15, 2020, Makenna, her children, and defendant moved into a two-bedroom, blue house on 11th Street in Pekin. Makenna and defendant shared one bedroom, which had a closet door that was broken and off its hinges. The other bedroom was too small and hot for the children, so they slept in a living room, which had no closets. There were no locks in this house, except for on the front and back door. Makenna was off work between June 15 and

- 23 -

June 29, 2020, because her car was broken. Makenna denied leaving her children with defendant in June 2020.

¶ 87    Makenna testified that the children started day care on June 29, 2020. Makenna and defendant would take the children to day care, and she would pick them up when she got off work. Between June 30 and August 24, 2020, the only time defendant was alone with her children was if they needed to be picked up from day care because they were sick; defendant would then pick up the children and drop them off at Harris's house. On Friday, August 21, 2020, M.G. started kindergarten. The next week, M.G. was at school on August 24 and 26 but had at-home learning on August 25. Makenna worked the week of August 24, so defendant took care of the children. On August 26, DCFS removed the children from Makenna's home, and the children went to live with Jeremy. Makenna identified defense exhibit No.1 as a copy of a court order entered on August 28, 2020, directing defendant not to have contact with her children. According to Makenna, defendant had no contact with her children since August 26, 2020.

¶ 88    On cross-examination, asked whether she was still dating defendant, Makenna responded that it was "a little hard to do while he's in jail." She acknowledged that she loved defendant and had two children with him. Makenna testified she was not aware that defendant told the police he moved in with her in February 2020. She said that if defendant had told the police he bathed the children without her being present, that would be untrue. Makenna testified that she started a job in March 2019 and she worked there continuously through "the time period we're talking about." Her children were enrolled in day care from May 2019 until COVID-19 started. The day care temporarily shut down, and the children returned on June 29, 2020. Makenna further testified that defendant moved out of the residence on 11th Street for "[p]retty well all" of July 2020, as she and defendant took some time to work on themselves.

¶ 89                                  c. Alice C.

¶ 90          Alice C., who is Makenna's mother, testified that she and her husband sometimes babysat Makenna's children. Alice was not aware of "the family" having any babysitters during July and August 2020. In July 2020, Alice would "pop in" at the residence on 11th Street during her lunch or afternoon breaks, and she would see Makenna, the children, and defendant. Makenna was always home when Alice stopped by. According to Alice, on August 24, 2020, Makenna, Makenna's children, and defendant went over to Alice's house on the lake and were there almost all day. According to Alice, DCFS took custody of the children on August 26, 2020.

¶ 91          On cross-examination, Alice testified that Makenna had been in a relationship with defendant since March 2020. Alice never stayed overnight at the house on 11th Street, and she was not there every day.

¶ 92                                  d. David C.

¶ 93          David C., who is Makenna's father, testified that Makenna and defendant started dating in March 2020. After defendant and Makenna moved to the residence on 11th Street on June 15, 2020, David had weekly contact with them. David never saw the children alone with defendant. David testified that defendant, Makenna, and Makenna's children were at David's house on the lake on August 26, 2020.

¶ 94          On cross-examination, David testified he was not aware that defendant told the police he moved in with Makenna in February 2020 and that he would be left alone with Makenna's children. David never lived at the 11th Street residence or spent a night there.

¶ 95                                  e. Defendant

¶ 96          Defendant testified that he met Makenna on December 17, 2019. In January 2020, he lived with his grandmother. On February 20, 2020, he moved into an apartment with his mother

and stepfather. He started dating Makenna on March 4, 2020, and he met her children sometime that month. Around March 8, 2020, defendant started staying with Makenna and her children. In April 2020, he continued to reside with Makenna, and she became pregnant with his child. Makenna was working at the time, and Harris would take care of Makenna's children if they were not in day care. Defendant denied being alone with Makenna's children in March, April, or May 2020.

¶ 97 Defendant testified that on June 4, 2020, he got "kicked off the property" where Harris and Makenna had apartments. Nevertheless, defendant took Makenna to work and accompanied her when taking the children to day care. On June 15, 2020, defendant, Makenna, and Makenna's children moved into a blue, two-bedroom house on 11th Street in Pekin. Defendant and Makenna shared the larger bedroom. Makenna's children originally stayed in the smaller bedroom but then moved to an enclosed porch. Neither of the bedrooms in the house had locks. His room had a closet door that was off its hinges.

¶ 98 Defendant testified that in July 2020, he never babysat J.G. and M.G. alone. Defendant did not think that Makenna worked that month, as they were without a functioning car for two weeks. Makenna returned to work once they got the car fixed. J.G. and M.G. continued day care up until August 21, 2020, when M.G. started kindergarten. During that time, defendant was present "on and off" at the 11th Street residence and did not stay there every night.

¶ 99 Defendant claimed that the only times he was ever alone with J.G. and M.G. were when he babysat them on August 24, 25, and 26, 2020. Specifically, on August 24, 2020, he was alone with the children "[f]rom 8:00 until 5:00" while Makenna worked. Defendant claimed he was Facetiming his mother and father while babysitting. Asked how long he Facetimed, he responded, "Normally almost the whole time I'm babysitting because I don't feel comfortable

watching kids alone." Defendant was never alone with the children during bathtime, though he assisted Makenna with bathing them. On August 25, 2020, Makenna worked half a day, and defendant again babysat the children while Facetiming his mother and father. Asked how often he called or Facetimed his mother, he responded: "Almost every time that I am babysitting or through—you know, almost every single day to be more specific." On August 26, 2020, defendant was alone with J.G. and M.G. during the morning. He was Facetiming with his mother and father when DCFS arrived. That was the last day he saw the children.

¶ 100  Defendant testified that M.G. was attending school in late August 2020. Specifically, M.G. was "at school on the 24th, at home on the 25th, and at school the 26th." Defendant denied committing the charged offenses.

¶ 101  On cross-examination, defendant testified he was born in December 1999. He denied telling the police that he moved in with Makenna in February 2020. He acknowledged that he told the police he would babysit Makenna's children alone when she was at work. He also acknowledged failing to tell the police that he only watched the children on three occasions and that he Facetimed Harris during those times. Defendant acknowledged that Makenna's children missed 11 days of day care between early July and mid-August 2020. Defendant testified that the children stayed with Harris on those days.

¶ 102        3. *Rebuttal*

¶ 103  The State called Palmer as a rebuttal witness. She testified that during his police interview, defendant said he moved into the 11th Street residence with Makenna in February 2020. The State played the portion of the interview where defendant made that claim.

¶ 104     D. Verdict, Posttrial Motion, Sentencing, and Appeal

¶ 105    The jury found defendant guilty on all three counts. The trial court denied defendant's posttrial motion and sentenced him to a cumulative total of 20 years in prison. Defendant timely appealed.

¶ 106                                    II. ANALYSIS

¶ 107    On appeal, defendant argues the trial court erroneously admitted into evidence (1) the Edwards recording, (2) unredacted versions of J.G.'s and M.G.'s CAC interviews, and (3) seven clips from defendant's police interview. Defendant also argues that his counsel rendered ineffective assistance by employing an unsound trial strategy throughout the proceedings.

¶ 108                            A. The Edwards Recording

¶ 109    Defendant first argues the trial court improperly admitted the Edwards recording to show the course of the police investigation. As part of this argument, defendant maintains the State failed to lay a proper foundation to admit the recording. Moreover, defendant contends the Edwards recording was "not at all necessary to explain the course of Palmer's investigation," as Palmer obtained that recording more than a month after she observed J.G.'s and M.G.'s interviews at the CAC. Finally, defendant asserts that "the manner in which the [Edwards recording] was created rendered the statements therein unreliable." Defendant emphasizes that Edwards was not trained to interview children, she used suggestive language while interviewing the children, and J.G.'s disclosure was "impossible to see and hard to hear."

¶ 110    The State responds that the trial court properly determined the Edwards recording was admissible under the doctrine of curative admissibility because defense counsel opened the door during his questioning of Palmer. The State further argues that Palmer laid a proper foundation for admitting the Edwards recording. According to the State, any prejudice in admitting

this recording was cured by the court giving the jury a limiting instruction. The State also submits that any error was harmless.

¶ 111          In his reply brief, defendant argues that the Edwards recording was not admissible under the doctrine of curative admissibility, as his counsel's questioning of Palmer "did not create any unfavorable inferences for the State."

¶ 112          Pursuant to the doctrine of curative admissibility, if defense counsel's cross-examination of a witness opens the door with respect to a particular subject, " 'the State on redirect examination may question the witness to clarify or explain the subject brought out during, or remove or correct any unfavorable inferences left by, the defendant's cross-examination, even if this elicits evidence that would not be proper or admissible.' " *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶ 71 (quoting *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 29). " 'The doctrine is protective, and only shields a party from unduly prejudicial inferences raised by the other side.' " *Hinthorn*, 2019 IL App (4th) 160818, ¶ 71 (quoting *Mandarino*, 2013 IL App (1st) 111772, ¶ 29). Ruling on a request to admit evidence pursuant to the doctrine of curative admissibility requires the trial court to balance " 'the need to rebut the inference raised against the risk of unfair prejudice that would be posed by the introduction of the rebutting evidence.' " *Hinthorn*, 2019 IL App (4th) 160818, ¶ 74 (quoting Michael H. Graham, Graham's Handbook of Illinois Evidence § 103.4, at 16 (10th ed. 2010)). We review the trial court's decision to allow curative evidence for an abuse of discretion. *Hinthorn*, 2019 IL App (4th) 160818, ¶ 74.

¶ 113          We hold that the trial court abused its discretion by allowing the State to play the previously barred Edwards recording pursuant to the doctrine of curative admissibility. The court mentioned multiple times that defense counsel used the word "video" when cross-examining Palmer. However, as defendant correctly notes in his reply brief, "[a]t no point did defense counsel

use the word 'video' or suggest that there was a recording of the outcry that the prosecution was hiding from the jury." Thus, the court's ruling appears to be premised in part on a mistaken recollection of the evidence.

¶ 114      Moreover, it was the *State* that elicited testimony from Palmer on redirect examination insinuating that J.G.'s and M.G.'s disclosures to Edwards were "consistent" with their subsequent disclosures. Defense counsel merely followed up on that point. In response to defense counsel's questions, Palmer testified that J.G. and M.G. were consistent as to who touched them and where. Thus, before the State requested to play the Edwards recording, the jury did not know there was a video recording of the disclosures made to Edwards but knew that those disclosures were consistent with later ones. Defense counsel raised no unfair inference that the State needed to rebut by introducing the previously barred Edwards video. Importantly, "the doctrine of curative admissibility is not a panacea; it does not permit a party to introduce inadmissible evidence merely because the opponent brought out some evidence on the same subject." *People v. Manning*, 182 Ill. 2d 193, 216 (1998). Rather, the rule "goes only as far as is necessary to shield a party from adverse inferences." *Manning*, 182 Ill. 2d at 216-17.

¶ 115      Moreover, there was no need to admit the Edwards recording into evidence to explain the course of the police investigation. Apparently, the trial court wanted to avoid admitting hearsay evidence for substantive purposes. However, the hearsay exception the court invoked requires a police officer to testify based on personal knowledge that he or she took some action after receiving information from a third party. *People v. Peoples*, 377 Ill. App. 3d 978, 984 (2007). Palmer had no personal knowledge of the statements made on the Edwards recording and identified no course of action she took that was specifically based on the information in this recording. Under these circumstances, it is not clear why the court believed this hearsay exception applied or why it

had any connection to the doctrine of curative admissibility. The jury did not need to view the Edwards recording to understand the course of the police investigation.

¶ 116        The State also failed to lay a proper foundation to admit the Edwards recording into evidence. At the section 115-10 hearing, the prosecutor conceded that Edwards and the children's stepmother would be "necessary" foundational witnesses for the Edwards recording. At trial, the State attempted to lay the foundation for this recording through Palmer, who merely testified that she received this recording during her investigation and that she recognized J.G. and M.G. Palmer did not personally witness the events depicted on the Edwards recording, so she could not testify that the recording truly and accurately depicted events that occurred. Thus, Palmer did not lay the foundation under the traditional method for authenticating a video recording. See *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001) (explaining that a party who has personal knowledge of a video recording that has accompanying audio may authenticate this evidence by verifying its accuracy). The State also did not lay a foundation to admit the Edwards recording under the "silent witness" theory, which provides a mechanism for a party to authenticate video evidence where no witness personally observed the events depicted on the recording. See *People v. Taylor*, 2011 IL 110067, ¶ 35 (identifying factors to consider when determining whether to allow a party to authenticate a recording by demonstrating the accuracy and reliability of the process that produced it). Notably, Palmer had no personal knowledge of when or where this recording was made, and she had no way of knowing whether the recording had been edited or manipulated before she received it from a third party.

¶ 117        The next question is whether the error in admitting the Edwards recording was harmless. In their briefs, the parties cite some cases addressing harmless error in the context of constitutional violations. However, this was a mere evidentiary error, and a different standard

applies where an error is not of constitutional magnitude. "A nonconstitutional evidentiary error is harmless if there is no reasonable probability that the jury would have acquitted the defendant absent the error." *People v. Forrest*, 2015 IL App (4th) 130621, ¶ 57. For the following reasons, we hold that the error was harmless.

¶ 118    The evidence against defendant was strong. J.G. and M.G. described defendant committing sexual acts against them that children their ages would be unlikely to understand, let alone fabricate. There was no indication that they were prompted by an adult to accuse defendant falsely.

¶ 119    By contrast, there were multiple inconsistencies in the defense. For example, the defense attempted to establish that defendant was only alone with the children on three occasions when Makenna was working and that defendant was Facetiming his mother the whole time. However, defendant testified he was alone with the children "[f]rom 8:00 until 5:00" on August 24, 2020, whereas his mother testified that they Facetimed for only three hours that day. There was a similar discrepancy with respect to August 25, 2020, as defendant testified that Makenna worked "half a day," whereas defendant's mother said they Facetimed for two and a half hours. Defendant also neglected to mention during his police interview that he was only ever alone with the children on three dates or that he Facetimed his mother the entire time. The testimony of Makenna's parents further undermined the defense, as they claimed that Makenna, defendant, and the children were at a lake house on either August 24 or 26, 2020. We also note that the defense witnesses were not entirely consistent with respect to the dates and months that defendant and Makenna lived together.

¶ 120    There was another major weakness in the defense. Defendant acknowledged that J.G. and M.G. missed day care 11 times in July and August 2020—a period when Makenna testified she was working. Although defendant claimed his mother babysat the children on those

days, defendant's mother testified that she (1) babysat the children only four times after April 1, 2020, (2) did not have very much contact with the children in July 2020, and (3) babysat the children only once in August 2020.

¶ 121   Moreover, although defendant never expressly confessed to the charges, he made numerous questionable comments during his police interview. Defendant answered, "Yeah, pretty much," when Thompson asked him whether he "maybe made a mistake" "expressing love." When Palmer said she was trying to figure out whether defendant "showed love a little too much and it went too—you know, one direction," defendant responded, "I mean, it probably could have, to be honest with you." When Thompson asked defendant to tell him about the time he touched one of the kids inappropriately, defendant responded, "I mean, the only time I ever touched them was in the shower." Defendant also said he never touched the children inappropriately, "besides from giving them a bath." Defendant said he did not "think" he was the person who sexually abused J.G. and M.G., but he later changed his answer to state he knew he did not abuse them. At the end of the interview, defendant asked the police: "Say I did do it. Okay. Let's just say I did it. What happens?"

¶ 122   Aside from the strength of the evidence against defendant, the inconsistencies in the defense, and defendant's suspicious statements during his police interview, we also consider that J.G.'s disclosure of sexual abuse on the Edwards recording occurred out of view of the camera and was difficult to hear. The fact that the jury was unable to hear and see the entirety of the children's disclosures reduced the prejudicial effect of the Edwards recording. Moreover, Palmer had already testified that the disclosures to Edwards were consistent with the children's subsequent disclosures. See *People v. Stull*, 2014 IL App (4th) 120704, ¶ 105 (explaining that the erroneous

admission of prior consistent statements "should rarely result in any meaningful prejudice to a defendant").

¶ 123    Finally, any prejudicial impact of the Edwards recording was also diminished because the trial court instructed the jury to consider this evidence only for the limited purpose of explaining the course of the police investigation. See *Hinthorn*, 2019 IL App (4th) 160818, ¶ 86 ("By limiting the questions asked and by instructing the jury on the limited purpose of the testimony, [the trial judge] limited any prejudice the testimony could have had."). We presume that the jury followed the court's instruction and did not consider the statements on the Edwards recording as substantive evidence. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 78 (presuming that the jury followed a limiting instruction).

¶ 124    Accordingly, although the doctrine of curative admissibility did not justify admitting the Edwards recording into evidence, the error was harmless.

¶ 125                    B. Challenges to the CAC Interviews

¶ 126    Defendant next contends the trial court erred in allowing the jury to view the CAC interviews in their entirety, "where the interviews contained several statements alleging highly prejudicial, uncharged other bad acts." Defendant focuses on (1) J.G.'s comments about seeing defendant sexually abuse other neighborhood children or classmates and (2) M.G.'s comments about defendant sexually abusing I.G. Defendant argues that these portions of the CAC interviews were inadmissible and unreliable. Defendant asks us to review this issue either pursuant to the first prong of the plain-error doctrine or for ineffective assistance of counsel.

¶ 127    The State responds that the trial court properly admitted the entirety of the CAC interviews pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2022)). Without any

elaboration, the State also references section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2022)), which authorizes other-crimes evidence for propensity purposes in certain circumstances.

¶ 128      To preserve an issue for appeal, a defendant must object during trial and raise the issue again in a posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. Failure to do so results in forfeiture of the issue. *Jackson*, 2022 IL 127256, ¶ 15. The plain-error doctrine is "a narrow exception to forfeiture principles." *Jackson*, 2022 IL 127256, ¶ 18. To obtain relief pursuant to this doctrine, a defendant must demonstrate that a clear or obvious error occurred and that either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 129      Typically, the first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *Moon*, 2022 IL 125959, ¶ 22. It is not sufficient that a defendant identifies an arguable error; rather, "the error has to just about leap off the pages of the record." *People v. Manskey*, 2016 IL App (4th) 140440, ¶ 82. Here, defendant challenges portions of J.G.'s and M.G.'s CAC interviews on two bases: (1) certain statements fell outside the scope of section 115-10 because they alleged defendant committed unrelated and uncharged crimes and (2) these statements were unreliable. For the following reasons, we hold that the trial court did not commit a clear or obvious error in allowing the jury to view the entirety of J.G.'s and M.G.'s CAC interviews.

¶ 130      We begin with defendant's arguments about the scope of section 115-10 of the Code. "[W]hether a child declarant's statements about the defendant's acts upon another child are admissible under section 115-10 of the Code depends upon the particular circumstances of a given case." *People v. Boling*, 2014 IL App (4th) 120634, ¶ 93. The statute allows the State to introduce

out-of-court statements by a young victim "describing any complaint of such act or matter *or detail pertaining to* any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." (Emphasis added.) 725 ILCS 5/115-10(a)(2) (West 2022). Thus, to come within the scope of section 115-10, a victim's allegations about uncharged conduct or acts committed against a different child must describe a detail pertaining to a charged offense involving the victim.

¶ 131　　　　Cases have "broadly construed" what it means for uncharged criminal conduct to pertain to a charged offense. Michael H. Graham, Graham's Handbook of Illinois Evidence § 803.25, at 1074 (2024 ed.). Factors a court considers include

> " '(1) the relationship of the declarant to the child upon whom the witnessed sexual act is perpetrated; (2) the proximity of such act—in time and place—to the act allegedly performed upon the declarant; (3) the similarity of the two acts; and (4) the existence of a common perpetrator.' " *Boling*, 2014 IL App (4th) 120634, ¶ 93 (quoting *People v. Peck*, 285 Ill. App 3d 14, 17 (1996)).

¶ 132　　　　In *Boling*, this court held that the victim's statement implying that the defendant sexually abused her cousin was admissible pursuant to section 115-10 of the Code, where the incident purportedly occurred in the same location and during the same time period as the victim's abuse. *Boling*, 2014 IL App (4th) 120634, ¶¶ 94-95. Likewise, in *People v. Embry*, 249 Ill. App. 3d 750, 763 (1993), this court held that one victim's hearsay statement about seeing the other victim being abused was admissible because it was a detail pertaining to the offense perpetrated against the declarant.

¶ 133　　　　Defendant does not mention the factors identified in *Boling*, let alone present an argument with respect to how those factors apply here. Rather, defendant cites two cases where

reviewing courts held that allegations regarding uncharged criminal conduct fell outside the scope of section 115-10. See *People v. Kinnett*, 287 Ill. App. 3d 709, 716-17 (1997) (holding that where the charging instrument alleged the defendant committed acts of sexual conduct at a trailer while camping on July 4, 1995, the trial court acted within its discretion by excluding the victim's hearsay statements accusing the defendant of committing other sexual acts against him on other dates and at different locations); *People v. Anderson*, 225 Ill. App. 3d 636, 650-51 (1992) (holding that where the charging instrument alleged a single instance of sexual assault occurring in April 1990, section 115-10 did not authorize the State to introduce the victim's hearsay statements accusing the defendant of other criminal conduct spanning a two-year period). However, *Kinnett* and *Anderson* are factually distinguishable because the indictment here alleged a 30-month time frame in which the charged abused occurred. We note that the reviewing court in *Kinnett* distinguished its facts from other cases where "the State did not specify the date or location of the alleged incidents." *Kinnett*, 287 Ill. App. 3d at 716.

¶ 134　　　　　Under the plain-error doctrine, "[t]he defendant has the burden of persuading the court to excuse his forfeiture." *Jackson*, 2022 IL 127256, ¶ 19. We hold that defendant has not demonstrated that a clear or obvious error occurred with respect to J.G.'s and M.G.'s statements exceeding the scope of section 115-10. Again, plain error must "just about leap off the pages of the record," and a defendant must do more than identify an arguable error. *Manskey*, 2016 IL App (4th) 140440, ¶ 82.

¶ 135　　　　　Defendant also challenges the reliability of J.G.'s and M.G.'s allegations in the CAC interviews regarding defendant abusing other victims. In assessing reliability, a trial court considers "the totality of the circumstances surrounding the making of the statements at issue." *Stull*, 2014 IL App (4th) 120704, ¶ 85. Notably, defendant's trial counsel conceded the overall

reliability of the CAC interviews, as the interviewer was a trained professional. On appeal, defendant likewise does not challenge the overall reliability of the CAC interviews.

¶ 136    Nevertheless, defendant notes that Palmer testified at trial that J.G. might have been referencing imaginary friends rather than actual people when he mentioned in his CAC interview that defendant abused other children from the neighborhood or classmates. However, in reviewing a decision to admit evidence pursuant to section 115-10 of the Code, "we do not focus on the evidence presented at trial, but instead, only on the evidence presented at the pretrial hearing concerning the reliability of the victim's hearsay statements." *Stull*, 2014 IL App (4th) 120704, ¶ 85. Thus, Palmer's testimony at trial is not a basis for challenging the trial court's reliability determination made at the pretrial hearing.

¶ 137    Defendant also notes that the trial court knew at the pretrial section 115-10 hearing that I.G. did not disclose being sexually abused. Thus, defendant reasons, M.G.'s references to I.G. being sexually abused were unreliable. However, we note that M.G. said during his interview at the CAC on July 6, 2022, that I.G. was three or four years old, which means I.G. would have been one or two years old when she last saw defendant in August 2020. Given I.G.'s extremely young age, her failure to disclose being sexually abused does not inherently undermine the reliability of M.G.'s statement that defendant sexually abused her. Defendant has not demonstrated that the trial court committed a clear or obvious error in determining that the entirety of J.G.'s and M.G.'s CAC interviews were reliable for purposes of section 115-10 of the Code. Accordingly, defendant is not entitled to relief pursuant to the plain-error doctrine.

¶ 138    Defendant alternatively argues that his counsel was ineffective for failing to "challenge and preserve the issue of the prejudicial other crimes evidence." To obtain relief based on ineffective assistance of counsel, a defendant must show both that trial counsel performed

deficiently and that such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 139　　　　As defendant has not shown that a clear or obvious error occurred, his ineffective-assistance claim fails. See *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 78 (noting that unless a clear or obvious error occurred, a defendant may not obtain relief pursuant to the plain-error doctrine or under an alternative claim of ineffective assistance of counsel). We further emphasize that defendant has not demonstrated that he was prejudiced by the jury viewing J.G.'s and M.G.'s full CAC interviews. Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Defendant proposes that "[t]he possibility that this hearsay other crimes evidence ultimately convinced the jury to find [him] guilty because they thought he was a bad person deserving of punishment cannot be discounted." The record does not support that conclusion. The jury learned that (1) I.G. never disclosed being sexually abused by defendant, (2) M.G. never claimed to have personally seen defendant sexually abuse I.G., (3) the police were unable to corroborate J.G.'s claim in his CAC interview that defendant sexually abused other neighborhood children or classmates, (4) Palmer believed J.G. might have been referencing imaginary friends when he mentioned neighborhood children, and (5) J.G. denied during his testimony that defendant sexually abused his classmates. In his closing argument, defense counsel argued that J.G.'s false accusations about defendant abusing other individuals meant he was lying or mistaken about his own abuse. Under these circumstances, we discern no reasonable probability that the jury convicted defendant based on a belief that he committed uncharged crimes and

deserved to be punished. In other words, the result of trial would not have been different had the trial court redacted small portions of J.G.'s and M.G.'s CAC interviews.

¶ 140 We note that the State mentions in its brief section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2022)), which allows prior bad acts to be used as propensity evidence in sexual abuse cases under certain circumstances. The prosecutor acknowledged before trial that she was not requesting to present evidence of I.G.'s sexual abuse pursuant to section 115-7.3. In her closing argument, the prosecutor did not argue that defendant's uncharged acts of abuse showed a propensity to commit similar acts. Thus, there is no issue for us to review with respect to section 115-7.3.

¶ 141 C. Challenges to the Clips of Defendant's Police Interview

¶ 142 Defendant further challenges the admissibility of some portions of his police interview, which he contends were irrelevant and highly prejudicial. Defendant first proposes that "a large portion of many of the clips" the jury saw included statements that police officers believed the accusations made by J.G. and M.G. According to defendant, such commentary was "improper because a witness is not permitted to comment on the veracity of another witness's credibility." Defendant next submits that the third clip was improper because it contained discussions about (1) defendant bathing J.G. and M.G. and (2) uncharged abuse against I.G. Defendant finally contends that the sixth clip "was edited in such a way that it misrepresented" his actual statement. Although defendant acknowledges he forfeited these issues by not raising them below, he asks us to review the matters for plain error or ineffective assistance of counsel. Defendant then references the arguments he made elsewhere in his brief with respect to the CAC interviews.

¶ 143 The State responds that the police officers' comments about the credibility of J.G.'s and M.G.'s accusations were "relevant and admissible to demonstrate the statements' effects on

- 40 -

defendant[ ] and to explain the course of the detectives' investigation." According to the State, Palmer and Thompson used a "standard interrogation tactic," and this evidence was not used by the prosecution as "present opinion testimony" regarding the credibility of J.G. and M.G. Furthermore, the State argues that the third clip, which included discussions about defendant bathing J.G. and M.G. and spanking I.G., was likewise admissible both "to demonstrate the statements' effects on defendant" and to "explain the course of the detectives' investigation." The State also argues that the sixth clip properly terminated where it did to avoid prejudicial discussions regarding polygraph examinations. The State maintains that any error with respect to the admission of these clips was harmless.

¶ 144    We hold that defendant has failed to establish either plain error or ineffective assistance of counsel in connection with the police officers' statements on the clips regarding the credibility of the accusations made by J.G. and M.G.

> "Statements made by police officers when questioning a defendant, including opinions and observations regarding the defendant's guilt or credibility, are generally relevant and admissible to demonstrate the statements' effects on the defendant, to provide context to the defendant's responses, or to explain the logic and course of the officers' interview or investigation." *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56.

Moreover, although it is improper for a witness to testify that another witness is credible, statements made during police interviews about credibility generally do not run afoul of that rule. See *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 58 ("[S]tatements of past opinions, rather than present ones, do not constitute improper lay opinion testimony."). Here, the references to the credibility of J.G.'s and M.G.'s statements were relevant and probative to illustrate defendant's

reactions. Defendant's reliance on *People v. Davila*, 2022 IL App (1st) 190882, does not change our analysis. In *Davila*, the prosecution played for the jury a "nearly three-hour long videotape" of a confrontational police interview where the defendant never made inculpatory statements. *Davila*, 2022 IL App (1st) 190882, ¶ 14. Thus, the appellate court reasoned that a police officer's statements during that interview regarding credibility "did not serve to show any transformation in defendant's story or provide helpful context." *Davila*, 2022 IL App (1st) 190882, ¶ 64. Here, by contrast, the jury saw only short clips of defendant's interview, which was nonconfrontational. Although defendant never confessed to committing the charged offenses, he made numerous statements that a reasonable jury could find noteworthy or unusual. We also note that the court in *Davila* reversed the defendant's conviction based on a preserved error, not based on the plain-error doctrine or ineffective assistance of counsel. *Davila*, 2022 IL App (1st) 190882, ¶ 74. Here, the references to credibility in defendant's police interview do not entitle defendant to a new trial.

¶ 145     We likewise hold that defendant has failed to demonstrate plain error or ineffective assistance of counsel with respect to the admission of the third clip. Bathing the children was not in itself a prior bad act. Rather, the discussion about bathtime was notable because it included defendant making the unusual remark that he never touched the children inappropriately, "besides from giving them a bath." Defendant's statements showed that he may have harbored distorted views about what constitutes appropriate versus inappropriate touching. Defendant's discussion about bathing the children arguably took on additional significance in light of defendant's trial testimony that he felt uncomfortable babysitting the children and thus rarely did it. If defendant felt comfortable enough to bathe Makenna's children, one might doubt his testimony that he felt uncomfortable babysitting them and thus needed to Facetime his mother the entire time.

¶ 146　　　　　Defendant's contention that the third clip included an irrelevant and highly prejudicial discussion of abuse against I.G. is hyperbole. In the third clip, in response to defendant's question, Palmer clarified that I.G. said she got "spanked on the butt." Spanking does not necessarily equate to abuse.

¶ 147　　　　　Defendant next contends that the jury should have heard additional portions of the sixth clip to put his statements in context. However, the trial court expressly offered defense counsel the opportunity to play additional portions of defendant's interview that were necessary to provide context, and defense counsel did not take the court up on its offer with respect to the sixth clip. The invited-error doctrine applies where a defendant acquiesces to the admission of evidence. *People v. Johnson*, 2023 IL App (4th) 220201, ¶ 33. Here, by focusing his objections on other clips, defense counsel led the court to believe there were no additional portions of defendant's interview that were necessary to contextualize the sixth clip, thus acquiescing to playing the sixth clip as tendered by the State. Although inviting or acquiescing to an error forecloses a plain-error challenge, a defendant may still argue that defense counsel "was ineffective for inviting the ruling." *Johnson*, 2023 IL App (4th) 220201, ¶ 38.

¶ 148　　　　　Defendant does not articulate a cogent argument that he suffered prejudice from his counsel's failure to ensure that the jury heard additional portions of the interview to contextualize the sixth clip. Defendant merely references the ineffective-assistance analysis from an earlier section of his brief that addressed a completely different issue. Forfeiture aside, defendant suffered no prejudice for purposes of *Strickland*, as we discern no reasonable probability that the result of the trial would have been different had the clip been edited differently. In the sixth clip, defendant said he did not "remember this ever happening" and that "if it happened, then I don't remember it." Palmer asked defendant whether he thought he "could have, like, blocked it out." The clip

ended without defendant answering that question. However, in the full version of the interview, which is also in the record, defendant answered Palmer's question, "No." He added: "I have a good memory, and I'm a hundred percent sure that this never happened." Contrary to what the State argues on appeal, this context would have been admissible, as defendant did not mention a polygraph examination until more than a minute and a half later in the interview. Nevertheless, even if defendant's answer had been included in the clip shown to the jury, it would not change the fact that the State's evidence against defendant was strong and there were multiple inconsistencies in the defense's evidence. Defendant made a noteworthy remark about not remembering sexually abusing J.G. and M.G. before backtracking when questioned about that remark. The fact that defendant backtracked hardly makes the remark less unusual. Defendant has failed to demonstrate prejudice, so his ineffective-assistance claim with respect to the sixth clip fails.

¶ 149  D. Claims That Defense Counsel Employed an Ineffective Trial Strategy

¶ 150  As his final claim, defendant argues his counsel "rendered ineffective assistance by employing unsound trial strategy throughout the proceedings." Specifically, defendant criticizes his counsel for (1) introducing evidence about the order entered in the juvenile court case directing defendant not to have contact with J.G. and M.G., (2) introducing testimony that defendant was uncomfortable being alone with J.G. and M.G., (3) questioning Palmer about whether J.G. had used particular words during his CAC interview, (4) mentioning in closing argument I.G.'s involvement with the abuse, and (5) encouraging the jury to rewatch the CAC interviews during their deliberations.

¶ 151  The State responds that defense counsel pursued a reasonable trial strategy and that defendant has failed to demonstrate he was prejudiced by his counsel's performance.

¶ 152        As noted previously, to obtain relief based on ineffective assistance of counsel, a defendant must show both that trial counsel performed deficiently and that such deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. With respect to the deficiency requirement, the United States Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the challenged action was sound trial strategy. *Strickland*, 466 U.S. at 689. Given *Strickland*'s mandate to accord deference to attorneys' decisions, "[s]trategic choices are virtually unchallengeable." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 62.

¶ 153        Defendant argues that evidence of the juvenile court order had "no probative value to add to the defense" because (1) the mere entry of the order did not prove the parties followed it and (2) the abuse allegedly occurred before the order was entered. Defendant maintains that such evidence was "very prejudicial" to the defense, as it was effectively other-crimes evidence suggesting defendant "had done *something* so harmful to the kids that a court prohibited contact." (Emphasis in original.)

¶ 154        Defendant's argument fails to acknowledge that the broad temporal range of the indictment posed an obvious challenge to the defense. The indictment alleged defendant committed three offenses against J.G. and M.G. sometime between January 1, 2020, and June 30, 2022. Defense counsel reasonably pursued a trial strategy that involved attempting to narrow defendant's window of opportunity to commit the offenses. Part of that strategy was to show that

defendant had no contact with the children after August 26, 2020—which was nearly two years before the sexual abuse allegations surfaced. But there was no risk-free way to introduce this fact into evidence, as the reason defendant never saw the children again was that DCFS removed them from the home due to physical abuse at the hands of either defendant, Makenna, or both.

¶ 155     Moreover, the cat was let out of the bag when Jeremy volunteered information during the State's case-in-chief about the children's abuse case in August 2020. Defense counsel later introduced evidence that (1) an order entered in a juvenile court case on August 28, 2020, prohibited defendant from contacting the minors and (2) defendant followed that order. Counsel likely weighed the helpful-versus-harmful value of introducing evidence of the order. Viewing the case with the deferential eye that *Strickland* demands, we cannot say that defense counsel's strategy with respect to the order was so unreasonable as to constitute deficient performance.

¶ 156     Defendant also argues that his counsel was ineffective for introducing testimony that he was uncomfortable being alone with J.G. and M.G. Again, we cannot conclude that counsel's performance was deficient. Defense counsel's obvious reason for introducing evidence that defendant Facetimed his mother was to show that he lacked an opportunity to commit the charged offenses on the three days he was admittedly alone with the children. Defense counsel likely recognized the need to offer the jury a plausible explanation for why an adult man would Facetime his mother for hours at a time on three straight days when he was supposed to be taking care of children. Introducing testimony that defendant felt uncomfortable watching the children alone was arguably a plausible reason and was not necessarily harmful to the defense.

¶ 157     Defendant next argues that defense counsel had no reason to question Palmer about whether J.G. used certain words during his CAC interview to describe oral sex. We see no indication that counsel performed deficiently. Although J.G. first used the word "popsicle" while

making a gesture indicative of oral sex, Lavin subsequently asked J.G. whether Donnie made him "do like you do with a popsicle." Defense counsel may have been attempting to get the jury to consider whether Lavin asked leading questions during the CAC interview. Alternatively, counsel may have been attempting to plant the seed that an adult coached J.G. with respect to the language he used in his disclosure. We note that defense counsel touched on that point in closing argument by emphasizing that the sexual abuse allegations surfaced after the children had spent two years with their father and that the children had talked to multiple people about their allegations.

¶ 158          Finally, defendant argues his counsel was ineffective for mentioning I.G.'s involvement in the abuse in closing argument and urging the jury to rewatch the CAC interviews during their deliberations. Counsel did not perform deficiently by making these arguments to the jury. In the context of arguing that the children's accusations were unworthy of being credited, counsel noted that M.G. "implied the sister was somehow involved." Considering that the jury knew I.G. did not disclose being sexually abused, it seems likely that defense counsel was using that fact to undercut the allegations made by M.G. We also see nothing deficient about defense counsel informing the jury that it could review the CAC interviews and "hear it for yourself exactly what the boys said." Defense counsel was attempting to demonstrate confidence and that he had nothing to hide. This strategy was not outside of "the wide range of reasonable professional assistance" and did not constitute deficient performance. *Strickland*, 466 U.S. at 689.

¶ 159                              III. CONCLUSION

¶ 160          For the reasons stated, we affirm the trial court's judgment.

¶ 161          Affirmed.