NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 250315-U

NO. 4-25-0315

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| AARON D. ELLIS, | ) | No. 17CF1002 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Peter W. Church, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Zenoff and Knecht concurred in the judgment.

**ORDER**

¶ 1   *Held*: By failing to object to excerpts of an eavesdropping recording on the grounds that the State had failed to lay a foundation for their admission and had failed to produce the complete recording in discovery, defense counsel erred, and the error prejudiced the defense, entitling defendant to a new trial because he received ineffective assistance.

¶ 2   In the circuit court of Rock Island County, a jury found defendant, Aaron D. Ellis, guilty of first degree murder (see 720 ILCS 5/9-1(a)(1) (West 2016)), in which the victim was Richard Smith, and aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), in which the victim was Stanley Golden. For aggravated battery, the court sentenced defendant to imprisonment for 10 years, and for first degree murder, the court sentenced him to a consecutive term of 50 years' imprisonment.

¶ 3   Defendant appeals on four grounds.

¶ 4   First, he argues that defense counsel rendered ineffective assistance by failing to

object to excerpts of an eavesdropping recording on the grounds of (1) the lack of a foundation and (2) the State's failure to produce the complete recording in discovery, making it impossible to ensure compliance with the doctrine of completeness and the *Brady* doctrine (see *Brady v. Maryland*, 373 U.S. 83 (1963)).

¶ 5        Second, he argues the circuit court erred by admitting propensity evidence of a shooting with which he was not charged.

¶ 6        Third, he argues the circuit court erred by allowing a detective to testify as an expert in street slang.

¶ 7        Fourth, he argues the circuit court erred by admonishing potential jurors that defendant's "failure" to testify should not be held against him.

¶ 8        Because we agree with defendant's first argument, it is unnecessary to the disposition of this appeal that we address his remaining three arguments. On the ground of ineffective assistance, we reverse the circuit court's judgment and remand this case for a new trial.

¶ 9                                    I. BACKGROUND

¶ 10        A. The 12th Street Shooting, From Which the Present Charges Arise

¶ 11        Golden testified that on November 14, 2016, he was living with his grandmother, Diane Mayfield, on 12th Street in Rock Island, Illinois. His uncle, Richard "Dobie" Smith, also was living in Mayfield's house, or at least he stayed there from time to time. At dusk that day, Golden was sitting on the porch when he saw "a huge flash," "felt the heat of bullets flying past [him]," and "heard bullets hitting the house and ricocheting off of things." He did not see a shooter or where the shots were coming from. He retreated into the house, unaware yet that he had been shot. Inside, Smith limped by, lifting his sweatshirt and shirt and telling Golden,

" ['C]all the ambulance, I'm shot, I'm dying.['] " Smith sat on a chair, and some friends who were at the house visiting applied pressure to his chest, trying to stop the bleeding, but Smith slumped to the floor and died.

¶ 12         Across the street from Mayfield's house, near a fence, the police found 17 empty cartridge cases. A bullet had punctured the rear windshield of a Chevrolet Malibu parked nearby. The police found the bullet behind an interior door panel of the car.

¶ 13         B. Two Other Shootings, Which Are Not Subjects of the Charges in This Case

¶ 14                          1. *The District Shooting*

¶ 15         On August 7, 2016, in what the parties call "the District area" of Rock Island, someone fired at a group of people in a parking lot. Two people were shot, including James Lee Brewer Jr., who sustained a gunshot wound to the head.

¶ 16         In the parking lot, the police found 10 empty cartridge cases.

¶ 17                          2. *The Davenport Shooting*

¶ 18         On November 26, 2016, there was a shooting in Davenport, Iowa, near a convenience store, Mother Hubbard's Cupboard. One of the gunshot victims was defendant, who was hit in the back and in the right forearm.

¶ 19         A Davenport police officer, Patrick Seivert, saw defendant in the emergency room of Genesis East Hospital and asked him how he had gotten shot. Defendant's only answer was, " [']I got shot, the fuck.['] " When Seivert asked him about two guns the police had found in a white Pontiac Bonneville automobile that had been left at the scene of the shooting, defendant decided he did not want to answer any questions.

¶ 20         The rear windshield and right rear passenger side windshield of the Pontiac had been shattered. On the right back seat was a Glock .9-millimeter pistol with an extended

magazine. The Glock pistol was People's exhibit No. 17. On the left rear passenger floorboard was a Springfield XD 40 pistol.

¶ 21                                    C. Forensic Evidence

¶ 22            1. *Defendant's Palm Print on the Rearview Mirror of the Pontiac*

¶ 23            Defendant's right palm print was on the rearview mirror of the Pontiac. Witnesses at the jury trial differed on whether this mirror was an interior mirror or an exterior mirror.

¶ 24            On the one hand, a police officer with the Iowa State Patrol, Michael Stegall, testified that when he dusted the Pontiac for latent fingerprints, "a potentially comparable print" was "lifted from the left exterior rearview mirror." He agreed with the prosecutor that the latent print lift cards in People's exhibit No. 18 "contain[ed] the lift that was taken from the left exterior mirror."

¶ 25            On the other hand, Garrett Alderson, the criminalist who compared People's exhibit No. 18 with "the known fingerprints or palm prints" of defendant and found a match—defendant's right palm print, which had been lifted from the rearview mirror—pointed out that a rearview mirror was, by definition, an interior mirror, not an exterior mirror. Alderson and defense counsel had the following discussion on that distinction:

> "Q. Okay. And that was from the exterior of the car rear-view mirror?
>
> A. No. The rear-view mirror is on the inside of the car, sir.
>
> Q. But according to the—what you just stated, it was on the exterior mirror?
>
> A. No. I was just reading off the location of each latent print lift card, sir.
>
> Q. If I gave you the prints back for clarity, would you be able to tell me where the actual print came from?

A. Yes, sir.

Q. Okay.

A. Right here, sir?

Q. Yes.

A. Okay. In this case, the latent print L-1, the right palm interdigital of [defendant], was identified on the rear-view mirror, sir."

Each of the latent print lift cards in People's exhibit No. 18 had written on the card the area of the Pontiac from which Stegall had lifted the print. On one of these cards—the card that, in Alderson's analysis, matched defendant's right palm print—Stegall had written "rear-view mirror," and Alderson understood the rearview mirror as being inside the car (unlike the side-view mirrors). (People's exhibit No. 18 does not appear to be in the record.)

¶ 26                     2. *The Empty Cartridge Cases*

¶ 27        Ballistic analysis revealed that 8 of the 10 empty cartridge cases from the District shooting had come from People's exhibit No. 17, the Glock pistol that, at the scene of the Davenport shooting, was found in the back seat of the Pontiac.

¶ 28        Ballistic analysis further revealed that all 17 empty cartridge cases from the 12th Street shooting, together with the projectile in the Chevrolet, likewise had come from People's exhibit No. 17.

¶ 29        So, the pistol that was used to kill Smith and wound Golden on 12th Street in Rock Island was the same pistol that was fired three months earlier in the District area of Rock Island and that, 12 days after the 12th Street shooting, was found in the back seat of the Pontiac in Davenport. It was the same Glock .9-millimeter pistol.

¶ 30        D. Admissibility of Excerpts of a Recording Made by an Eavesdropping Device

¶ 31    In October 2017, defendant was in jail in Mercer County, Illinois, on unrelated charges. The circuit court of that county authorized the placing of an eavesdropping device in the cell occupied by defendant and a confidential informant, Daquan White.

¶ 32    In the present case, pursuant to sections 108A-9 and 114-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/108A-9, 114-11 (West 2020)), defense counsel moved for a suppression of the recording that had been made by the eavesdropping device. The grounds of the motion were those listed in section 108A-9(a)(1) to (3) (*id.* §108A-9(1)-(3)):

> "(1) the conversation was unlawfully overheard and recorded;
>
> (2) the order of authorization or approval under which the device was used or a recording made was improperly granted; or
>
> (3) the recording or interception was not made in conformity with the order of authorization."

¶ 33    On December 13, 2021, the circuit court held a hearing on the motion for suppression. The hearing also concerned a motion by the State: the State sought a ruling that, at the upcoming trial, evidence of two other crimes would be admissible, namely, the District shooting and the Davenport shooting.

¶ 34    The circuit court first took up defendant's motion for suppression. In support of that motion, defense counsel called a Rock Island police officer, Benjamin Meiresonne. Here are the relevant points in Meiresonne's testimony.

¶ 35    In 2017, White was in jail because of a pending drug case. About three weeks after the Davenport shooting, he approached the authorities, offering, in return for consideration in his drug case, to be a confidential informant against defendant. According to White, defendant had disclosed to him his involvement in the District shooting, the shooting of Smith, and the

Davenport shooting.

¶ 36　　　　　Because both defendant and White were under federal arrest and were in the Mercer County jail "under an agreement with the federal government to house federal prisoners," it was agreed (or "it was determined," as Meiresonne put it) that after the Mercer County circuit court issued an eavesdropping warrant, it would be the Federal Bureau of Investigation (FBI) that would conceal its own eavesdropping device in the cell shared by defendant and White. Meiresonne testified:

> "When we first were discussing applying for the overhear, we had the Rock Island County State's Attorney's Office involved, the Mercer County State's Attorney's Office involved, and since *** both subjects were at that time under federal arrest, the US attorney's office here locally was involved, and then the Department of Justice was actually involved, and it was determined that the FBI would place the recording equipment and that they would then obtain the recordings and that they would be basically scrubbed before they ever came to me."

In other words, before handing the recordings over to the Rock Island police, the FBI would delete the parts of the recording that, in the FBI's opinion, were irrelevant to the investigation of Smith's murder. The apparent purpose of this scrubbing would be to protect the FBI's investigation of other crimes that defendant and White might discuss in their jail cell.

¶ 37　　　　　The Mercer County circuit court issued the eavesdropping warrant, the FBI hid the eavesdropping device in the jail cell, and a continuous audio recording was made "for approximately seven days, 24 hours a day." Meiresonne, however, was "only privy to three or four recordings," "a winnowed down or a limited portion of the totality of the tapes," "based on

what was determined by others," including a Mercer County judge, to have been "pertinent to [his] case only."

¶ 38    On cross-examination in the hearing, Meiresonne proceeded to summarize what he had heard in the scrubbed recordings. While Meiresonne was recounting what he had heard defendant tell White, on "tape," about the District shooting, defense counsel objected, "That's facts not in evidence."

¶ 39    Defense counsel explained, "We listened to over 60 hours of *** a lot of wiretaps, a lot of stuff that wasn't even *** admissible or needed, but we listened to it and I didn't get to what [Meiresonne] is saying on the stand." The prosecutor replied, "It has actually been reduced to that [and] then provided to the Rock Island Police Department by the FBI. We got that reduction." Meiresonne's summary, the prosecutor observed, was "not a word-for-word repetition because much is spoken in slang and dialect, which is to be blunt, and from time to time, as I listened to it, hard to interpret." Defense counsel responded, "I'll be willing to say that a lot of things are interpretation and maybe I understood it differently from counsel, but if he saw only three or four videos [*sic*], I would love to listen to those three or four videos." Defense counsel reiterated, "The only thing I would need is the three or four videos or wiretaps that [Meiresonne] stated that he listened to." The prosecutor agreed to provide to defense counsel the recordings that Meiresonne had listened to and on which he had based his summaries. The prosecutor explained that he had come to the case late and that he had assumed that "that was provided earlier."

¶ 40    The circuit court decided to keep the record open so that the prosecutor could make sure that defense counsel had been provided the three or four recordings that Meiresonne had listened to and which he had purported to summarize in his testimony. Defense counsel

- 8 -

commented, "I believe [Meiresonne] sent me everything he has. He has been very responsive."

¶ 41　　　　While not ruling out the possibility that there was "other stuff out there," the prosecutor stated, "[T]he stuff that I received, occurred on October 14th." Defense counsel replied, "Okay. 'Cause I have a stack of October 14th. It just—I don't know what [Meiresonne] heard. So, if I can get you know—"The circuit court observed that, presumably, the State did not want "to have the jury *** stay up for five or six days" listening to seemingly "endless" recordings, so it would probably be necessary, anyway, to pinpoint the relevant parts.

¶ 42　　　　The circuit court and the prosecutor agreed that, with respect to what parts Meiresonne had listened to, the problem might have been one of finding a needle in a haystack:

> "THE COURT: Maybe it's more at this point—how many hours you got, 60?
>
> [THE STATE]: Yeah, 60.
>
> THE COURT: So, in other words, it's not that it doesn't exist, it's finding it.
>
> [THE STATE]: Yeah."

¶ 43　　　　On January 14, 2022, at the next hearing, which was by telephone, defense counsel stated, "I was in receipt of three videos [*sic*] that [were] tendered to me by the police officer in which he based his testimony off of. There are *** three disks and 30 minutes apiece, so about 90 minutes." Defense counsel claimed that "what he's testifying to *** is not on these videos." Because it would have been difficult to untangle this question over the telephone, the parties agreed to schedule a hearing in person, leaving the record open.

¶ 44　　　　The next hearing, which was in person, was held on March 7, 2022. Defense counsel called Meiresonne on redirect examination. Meiresonne testified he had listened to only

those portions of the recording "that the FBI office had said [were] pertinent to [his] investigation": three recordings, each of which was roughly 30 minutes long. He testified that "[t]here were other recordings in that seven-day period [he] did not listen to." Without objection by the prosecutor, the circuit court admitted the three recordings into evidence as defense exhibit Nos. 1, 2, and 3. Defense counsel asked Meiresonne, "And those would be the recordings that you distributed to the defendant, as well as the State?" He answered, "The defense *** and, well, the State was given every recording for that seven-day period. I only had privy to a few of them."

¶ 45　　　　After they finished questioning Meiresonne, the attorneys made their arguments on defendant's motion for suppression and the State's motion for the admission of evidence of other crimes. The circuit court ruled that at the jury trial, the State would be allowed to present evidence of the District shooting and the Davenport shooting to prove the identity of Smith's murderer. Thus, the court granted the State's motion for the admission of evidence of those other crimes. The court denied defendant's motion to suppress the excerpts from the eavesdropping recording.

¶ 46　　　　　　　　　　E. "Failure to Testify"

¶ 47　　　　On January 9, 2023, during the *voir dire* of potential jurors, the circuit court instructed each venire panel that a defendant's "*failure* to testify cannot be held against him."

¶ 48　　　　F. The Presentation, at Trial, of Excerpts From the Recording

¶ 49　　　　　　　　　1. *Transcription of the Audio Files*

¶ 50　　　　Before trial, Meiresonne testified that the eavesdropping device in defendant and White's cell had run for seven days. At trial, by contrast, he testified that it ran continuously for approximately four days, from October 13 to 17, 2017, and that as the eavesdropping was going on, the FBI sent him excerpts of recorded audio material that the FBI deemed relevant to his

investigation of the Smith murder. Judge Conway of the Mercer County circuit court, who had issued the eavesdropping warrant, also reviewed "those recordings" for relevance. Meiresonne had listened to the recordings the FBI had sent him between 15 and 20 times, and his secretary had transcribed the recordings. He had checked the transcripts against the audio material, ensuring that the transcripts were verbatim, and had made any revisions as necessary. Whenever what was spoken in the audio recording was unintelligible, Meiresonne—following along in the draft of the transcript on his computer—would type "UI" in brackets (meaning unintelligible). He identified People's exhibit No. 41 as the completed transcriptions and People's exhibit No. 42 as a thumb drive containing the audio files that had been transcribed. He believed that People's exhibit No. 41 accurately transcribed the audio files in People's exhibit No. 42. These audio files were nine separate recordings, each of which was from 1 to 12 minutes long.

¶ 51       The prosecutor moved for the admission into evidence of People's exhibit Nos. 41 and 42. Although defense counsel stated he had no objection to People's exhibit No. 42, he objected to People's exhibit No. 41 for three reasons. First, he characterized People's exhibit No. 41 as a biased interpretation by the lead detective in this case. Second, defense counsel argued that Meiresonne was "not qualified as an expert in linguistics or transcribing." Third, defense counsel had found that the recordings in People's exhibit No. 42 were "hard to understand and hear," and Meiresonne had testified that his transcription was different in some ways from his secretary's transcription.

¶ 52       The prosecutor's response was fourfold. First, the purpose of People's exhibit No. 41 was "not to interpret the meaning of the words spoken"—the prosecutor would ask "another witness" to do that—but, rather, to "accurately transcribe[ ] the words spoken." Second, the prosecutor was aware of no authority for the premise that to transcribe an audio statement, one

had to be qualified as an expert. Third, any "potential bias" could "be explored on cross-examination." Fourth, the prosecutor anticipated the giving of a jury instruction that if the jurors "perceive[d] a difference between the transcript and the audio, they [were] to rely on the audio."

¶ 53    The circuit court admitted People's exhibit No. 42 into evidence, noting that this exhibit was admitted without objection. Then, after listening to the audio files in People's exhibit No. 42 *in camera*, during a recess, and confirming that People's exhibit No. 41 appeared to accurately transcribe them and that the parts designated in People's exhibit No. 41 as unintelligible were indeed unintelligible, the court concluded that People's exhibit No. 41 would be helpful to the jury and, accordingly, admitted it into evidence, over defense counsel's objection.

¶ 54                              2. *A Translator of Slang*

¶ 55    Before the State called Detective Paul Girskis of the Rock Island Police Department as its next witness, the circuit court did two things. First, it instructed the jury that an electronic recording had been admitted into evidence and that, in addition, there was a transcript of the recording. The recording, the court instructed the jury, was the evidence, and the transcript was merely an aid, and if the jury perceived a conflict between the two, "the electronic recording controls." Second, the court acceded to defense counsel's request (to which the prosecutor had no objection) for a *voir dire* of Girskis, outside the jury's presence, to determine whether Girskis was qualified to do what the prosecutor proposed having him do: translate the slang in People's exhibit No. 42.

¶ 56    In the ensuing *voir dire*, Girskis testified he had been a police officer since September 2006. After attending the police academy and undergoing training in the field, he spent "a year in street crimes," assisting the narcotics unit of the Rock Island Police Department.

- 12 -

He then served "about three and a half years in *** Rock Island narcotics as an undercover officer" and, afterwards, "a little over two years with the FBI gang task force." Then he "went a little over five years with the Quad City [Drug Enforcement Administration (DEA)], the DEA Task Force." In January 2021 he was assigned to the criminal investigations division, in which, recently, "a new special investigations unit" was created, and he would "be back assigned to the DEA Task Force." From his 11 years of experience with the various agencies that "Rock Island Narcotics" had worked with and his hundreds of conversations and interviews with suspects and cooperators, he had become familiar with "street slang" and its evolution during that period. In fact, when working as an undercover officer, he was obliged to use street slang himself to appear convincing and to avoid arousing suspicion.

¶ 57       The prosecutor showed Girskis People's exhibit Nos. 43 and 44: two sheets of paper listing, in the left-hand column, phrases or terminology the speakers used in People's exhibit No. 42 and, in the right-hand column, the meanings of the phrases or terminology in Standard English. Girskis testified he was familiar with the street slang in the left-hand column. He further testified that he had "listened to certain audiotapes of a recorded conversation between the defendant and the cooperating witness in this case, Daquan White," and that, having "encountered *** and talked with" defendant 10 to 20 times and having "encountered" White about 10 times, he could identify their voices. He recognized the voices in the audio recordings: the higher-pitched voice was that of defendant, and the lower-pitched voice was that of White. Also, Girskis testified that he understood the slang that was used in the recordings.

¶ 58       On cross-examination by defense counsel during the *voir dire*, Girskis admitted he had never "been a part of any peer-reviewed panels, discussions, articles, in regards to slang." He agreed that slang evolved, perhaps daily, and he admitted he did not know every slang word.

¶ 59        Defense counsel objected to the prosecutor's tendering Girskis as an expert in slang. The circuit court overruled the objection, ruling that Girskis was "an expert in the topic or subject of street slang."

¶ 60        The jury reentered the courtroom, and the prosecutor called Girskis as a witness. Girskis recounted his experience in law enforcement and how he had learned street slang over the years by interacting with hundreds of witnesses and suspects on the street. The prosecutor tendered Girskis as an expert in street slang.

¶ 61        Defense counsel objected for three reasons. First, he argued that because Girskis worked for the police department that was assisting in the prosecution of defendant, Girskis would be biased and would "interpret what he hears in the best light of the police." Second, defense counsel observed that Girskis had "no formal education to qualify him as an expert in the African-American vernacular." Third, the speakers in the audio recording conversed in English; the jury was made up of "all native English speakers"; and "[t]o allow a slang expert, because [defendant was] black," would be, in defense counsel's view, "racial discrimination." Defense counsel observed that words that were once considered slang were now in the dictionary. He argued that most of the words that defendant spoke in the audio recording were English and that "[y]ou don't need an English or slang interpreter to interpret English."

¶ 62        The circuit court noted that in criminal courts throughout the country, it was commonplace to hear "testimony from law enforcement officers regarding something that might sometimes [be] refer[red] to as street slang." The court found that, through his experience as a police officer, Girskis had acquired "particular knowledge as to street slang, sufficient for him to be qualified as an expert under Illinois law"—"[w]hich is not a high bar in terms of expert testimony." So, the court ruled, "I'm going to allow him to be tendered and find that he can be

examined as an expert in the field of street slang."

¶ 63    Girskis identified defendant in the courtroom and testified that, having had conversations with him 10 to 20 times, he was able to identify his voice. Also, Girskis testified that, by virtue of his "probably [10]" conversations with White, he was able to identify White's voice, as well. Girskis had "listened to the audio of the overhear tapes" and had recognized the higher-pitched voice in those recordings as that of defendant and the lower-pitched voice as that of White.

¶ 64    Before playing People's exhibit No. 42 in his direct examination of Girskis, the prosecutor requested that the bailiff distribute the transcripts, People's exhibit No. 41, to each of the jurors so that they could "at their discretion refer to them while they listen to the audio tapes." Defense counsel objected to the distribution of the transcripts, but the circuit court ruled, "I am going to permit the jurors to have those transcripts, subject to the instruction I gave them earlier, which is that if you perceive a difference between the transcript and the electronic recording, the electronic recording controls." The court added, however, that, once the recording was played, the transcripts were to be taken back.

¶ 65    In transcript No. 1-1, Girskis explained (after the corresponding portion of People's exhibit No. 42 had been played), defendant told White he had gotten "into it" with Smith ("Dobie") because Smith had gotten into a dispute with Keomi Neely, Smith's girlfriend, who had been staying at defendant's house. Smith was angry with Neely because (to quote Girskin's paraphrase) "she took some of his ecstasy, his jigs, [and] brought them over to [defendant's] house." As defendant put it in the recording, Keomi had given Smith some money, which Smith had spent "on liquor and shit," and she "get mad and snatched all his jigs." Consequently, Smith "kicked in" defendant's "crib," his house, "trying to beat Keomi up."

¶ 66    Transcript No. 1-2 corresponds to the part of the recording in which defendant recounted for White his conversation with Smith when defendant came to the door in response to Smith's knocking. " ['L]ook cuz,['] " defendant told Smith. " [']You at my door right now. Cuz.['] I'm like nation." ("Nation" was an exclamation, Girskis explained.) " [']Catch this Bitch when she leave.['] I'm like ['Y]ou at my crib. Nation. I'm dirty in this bitch['] "—meaning, as Girskis explained, "I have contraband in my house." "Then [Smith] like ['W]ell yeah.['] Nation, so I walked off," defendant said. "I tell her what's going on." Defendant assured Neeley, " [']But I ain't finna [(fixing to)] let him come up in here, I aint gonna let him do nothin to you.['] "

¶ 67    "Motherfucker what you think I'm soft or somethin," defendant mused. He went "up in the room," to quote transcript No. 1-3—but he had forgotten: "I ain't leave no claps in the crib to, uh, this day." Rather, "my claps is in the a [*sic*] whip," which was "[a]cross the street." (A "clap" was a gun, Girskis explained, and a "whip" was a car.) "So now I'm like damn," defendant continued, "I got one in the alley too. I'm like shit fuck it. I'm just going to go out back and then just pop up on him and make him move around." So, defendant went to the alley to "get the clap," but when he "come back to the front," Smith was gone. Neely, "standing on the porch now," told defendant that Smith "ran that way." Then, to quote defendant, "I hit the whip and now I got both the claps now. I'm riding," and " [']f I catch you before you get to the crib, Bitch you dead.['] " He added, "I don't give a fuck what Keomi talking about. And if the bitch acting stupid when I get back, (UI) tellin he dead, I'm smokin her.['] "

¶ 68    Defendant "pulled down 12th [Street]," but "[h]e made it to the crib hella fast. He was outta there." When defendant "pull[ed] up to the crib," Smith was "standing on his porch." Defendant recalled to White, "I went up on the side, a little side street. (UI). I got both claps on me, I'm like ['H]ey cuz, what's up[?'] " Smith answered, " ['W]hat you mean, (UI)[?'] "

Defendant said to him, " [']I told you *** ya gotta catch that bitch when she leaves.['] " Smith responded, " ['L]ook, man. I ain't scared of no motherfucker.['] " Defendant then was "hotter than fuck up this bitch," but the next thing he knew, "the laws"—the police, Girskis explained—"ride past" and "look at us hella hard." "Now I got fuckin dip on the laws," defendant said (in other words, he had to avoid the police, Girskis clarified). The "Law's snatch him up," that is, arrested Smith, because "Keomi just said he beat her up."

¶ 69        Nevertheless, in transcript No. 1-3, defendant resolved as follows: "I come down here and I'm send some shots in this motherfucker. I'm a see how you feel after I burn yall shit up for about a week. Better not get caught lackin (UI) I'm a pop yo ass (UI). That's what's in my head." Girskis translated:

> "So that would be, I'm going to see how you feel after I [']burn yall shit up for a week,['] meaning like shoot your house up, or shoot at you for a week. [']Better not get caught lackin,['] better not get caught like sleeping or being relaxed, not looking over your shoulder, 'cause he's going to [']pop yo ass,['] means *** I'm going to shoot you."

¶ 70        White noted to defendant that "Dobie[ ] got kilt on his birthday" or, as he had heard someone named Duck put it, Dobie "came on his birthday and left on his birthday." White remarked that Duck was "wild as hell." He commented to defendant, "Then when you told me that mother fucker still on that, it was on that thang, and your ass kept ridin with it. I'm like, you tweak. You done a hundred motherfuckin (UI) digs." Defendant corrected White, "I did a million drills on that bitch," and "I popped everybody with that bitch." He was so pleased with the gun's performance that "I'm going to get me a couple of these when I get out."

¶ 71        Defendant added, "Keomi had told me about, *** she like ['Y]eah. I was out

there, and motherfuckin'—we didn't even see who was shooting or what the fuck. All we saw was flashes.['] I'm sitting right there like, ['Y]es. Thank you.['] but, Nation—I know firsthand ain't nobody saw shit." "Right," White acknowledged. Defendant continued, "You still blame it on your cousin though. You bogus as hell. She even blamed it on our cousins."

¶ 72 Girskis testified that the next transcript, transcript No. 2, had to do with the District shooting, in which two people were shot: Kyra Golden and Brewer. Defendant recounted to White that he was walking when Brewer stopped him, saying " [']Shits, what's up[?'] " They decided to exchange telephone numbers, but because defendant's phone was dead, defendant told Brewer, " [']Text my shit.['] " As Brewer was typing some text, "Somebody get to moving (UI) in the back ***. [M]otherfucker pop up out of the mothercukin backseat. Hella fast. Rollin['] like that. Boom boom boom boom boom. Hit him five times." "He got hit five times. I put that bitch on him, we this close." White remarked, "I know [Brewer] got hit in the face." Defendant explained, "Oh yeah that was at the end, cuz I was mad. I thought about it, I'm like ['Y]eah I thought you set me up.['] ([White] Laughing) Boom. Came back (UI) put that bitch on his face though. On my mama." "Yeah I hit [Brewer]," defendant said, "I only shot him once ***." The man in the back seat, who had popped up, got out of the car and started running, and defendant "was leaning over the car" and "Blowin like 3 times." That was when defendant accidentally shot Neely. He recalled, "So yeah, I'm like blow, like 3 at him after I hit him with the 5 then I blow 3. Boom. I hit her with the 3rd one and he ran on the other side of Webb truck. I was just talking to Webb." Defendant remarked, "Now I feel bad as hell, now I'm like fuck. I seen when I did it too. *** I know I done hit her." Now, every time he saw Neely, he stopped and gave her hugs and tried to give her money. He said, "[T]hey wasn't sure if she was going to get to carry nor more. I think she can. But."

¶ 73       Transcript No. 3 was about the Davenport shooting. Defendant told White that a man named DT was with Dae Dae, which, Girskis knew from his work in law enforcement, was the nickname of James Earl McKinney. DT, defendant said, "kept trying to get me to pick him up" and kept trying to become chummy. "[H]e like, ['H]ey you still in that white thang[?'] " and defendant replied, "[B]itch ass n***, don't be asking me for what kind a car I at (UI).['] " Defendant told DT to get out of his car, and he stopped answering DT's calls. Defendant had just sold Dae Dae "a three five" (meaning, Girskis explained, 3.5 grams, or an eighth of an ounce, of marijuana), and Dae Dae called defendant's phone and requested to buy "another three five." "We be down here in the District," defendant recalled. He pulled into a dead end alley—he did not know why. He had with him "two claps": the "thirty *** and a little forty." "The 30," Girskis clarified, "is a handgun or a pistol with a 30 round magazine, so it would be an extended clip," and the "40XD" (as defendant also called the other gun) was "a Springfield .40 caliber pistol." Defendant and Dae Dae were in defendant's car. Defendant had just made a reefer for Dae Dae and was about to make one for himself when "three motherfuckers walked past me." Defendant "grab[bed] both claps" and "hand[ed] cuz one," that is, handed one of the guns to Dae Dae. The three men "walk past"—or "at least [defendant] thought they walked past." "They like, they just got outta plain view. They musta ran, dead back up on the whip." Defendant "turn[ed] and looked at cuz" and tried to figure out "how to pop this bitch." The three men who had been strolling past opened fire on defendant and Dae Dae—at least two of the three did so. Defendant recalled, "I'm blowing in the car. Outside. *** He ran up behind *** the whip. I'm blowing through *** the back window. I'm get to blowing through the backseat, trying to get him through the trunk." Defendant was shot in the back and in the top of his arm and was grazed on the back of his head. He felt his arms going limp, so, while the shooting was still going on, he got out of

the car and fled on foot. Although it might have taken him two hours to do so, defendant made his way to the "crib" of "Little D." White asked defendant, "That shit was by Mother Hubbard's wasn't it[?]" "Yeah," he answered. "How the fuck did you get from Mother Hubbard's to D crib?" White asked. "I walked," defendant answered.

¶ 74 In transcript No. 5, defendant said that DT told him, afterward, that "his brother came out and *** hopped out of the car and moved it, and got up outta the alley and put it in the other alley." "But that don't make sense," defendant reflected. "And *** the motherfucker say he left the bangers in the car." ("Bangers," Girskis clarified, was another term for guns, as "claps" also were guns. "So—[']I know you ain't leave it,['] " defendant remarked incredulously. "There a body on that bitch. You're an idiot if you did that." (The phrase "there is a body on that bitch," Girskis explained, meant there was a dead body—there had been a murder—by the use of that gun.) White asked defendant, "[W]hy the fuck did you keep it?" Defendant replied, "Cuz I was finna keep putting shit on that bitch." "I kept[ ] bringing it back out." "Meaning, [']I was going to keep using the gun like in the future like,['] " Girskis translated.

¶ 75 In the final transcript, transcript No. 6, defendant told White, "Cuz now one of them D n*** got that motherfucker." The prosecutor asked Girskis:

"Q. Detective Girskis, from your knowledge of this investigation, was a .9 millimeter Glock with an extended clip and a Springfield XD 40 semi-automatic seized by the police or retrieved by the police in the shooting at 3rd and Division by the Mother Hubbard's?

A. Yes.

Q. Okay. When the statement is made by [defendant] that the Ds or the D n*** have—have that, what did he say?

- 20 -

A. He said, [']cuz now one of them D n\*\*\* got that motherfucker.[']

Q. Okay.

A. So that—he's implying it's the Davenport Police.

Q. Okay. The D for Davenport?

A. Yes."

¶ 76        Defendant continued, in his conversation with White, "Y'all better hope y'all people up that bitch in the D because the D is running that bitch back. I would have fled to Alaska they be \*\*\* [c]hecking that type of shit. The D be about that little [crime scene investigation (CSI)] shit." In other words, Girskis testified, if defendant had known that the Davenport police had gotten possession of the gun, he would have fled to Alaska because the Davenport police were "good with like the CSI, like the forensics and fingerprint and all that type of stuff." "Running that bitch back" meant "checking into the gun, like ballistics and all that type of stuff." Transcript No. 5 ends with defendant's exclaiming, "Waht, 90 thousand shootings cuz."

¶ 77                              G. White's Testimony

¶ 78        The State called White, who testified substantially as follows.

¶ 79        In August 2016, White was in the parking lot during the District shooting, when Kyra and Brewer were shot. When asked whether he saw defendant shoot Kyra, he answered, "We didn't know she was shot until later that night, but there was shooting, yeah." But he saw defendant shoot Brewer in the face with a Glock pistol that had an extended magazine. White saw defendant in possession of that pistol both before and after the District shooting.

¶ 80        After the shooting in Davenport in November 2016, White picked defendant up from the hospital in Davenport.

¶ 81　　　　　White remembered that when he and defendant were in the Mercer County jail, White agreed to participate in a conversation with defendant, but he could not remember any of the conversation. He could not remember whether, in the "court-ordered overhear," he discussed with defendant the shooting of Smith. He granted the possibility that he discussed that subject with defendant, but he could not remember for certain that he did so. He explained, "It's been too many years ago for me to even have—I couldn't even tell you a conversation that happened last year." White doubted it would help even if the prosecutor showed him a transcript of the conversation. "The conversation that you showed me," he noted, "I couldn't even remember, so [it] wouldn't." Nor could he remember the conversation he had with defendant after picking him up at the hospital.

¶ 82　　　　　White denied being involved in the Davenport shooting or in the shooting of Smith.

¶ 83　　　　　On cross-examination, White testified he was "on federal charges" when he reached out to the state's attorney, "seeking something in return for information." But he denied that the authorities gave him anything in return. "I was given on offer," he explained, "but I done did all my time already, sir"—or "almost already."

¶ 84　　　　　White testified that, in the District shooting, "We didn't see Kyra get shot" but that, "[l]ater on down the night, that night, we found out she had got shot." For that matter, "[w]e didn't even really see Jack Brewer, but we knew he was shot in the car."

¶ 85　　　　　Defense counsel asked White:

"Q. *** Do you know who killed Dobie?

A. They say [defendant]. Do I know for sure? No.

Q. You said you don't know?

A. No, not for sure.

Q. But somebody told you?

A. Yes.

＊ ＊ ＊

Q. Okay. But you didn't see it?

A. No. I wasn't there, so I couldn't tell you."

¶ 86 Then the prosecutor and White had the following exchange on redirect examination:

"Q. In fact, Mr. White, the person who told you he shot and killed ＊＊＊ Smith was [defendant], wasn't it?

＊ ＊ ＊

A. In one of the conversations or another, yeah, but I don't remember what conversation because I don't remember the conversations.

＊ ＊ ＊

Q. In one of the conversations, [defendant] told you he shot and killed Dobie Smith, didn't he?

A. In one of the conversations. Like I said, I don't remember the conversations that we had. It was so long ago. But, yes, in one of the conversations."

¶ 87 On recross-examination, White testified, "I read the conversations with the transcript and it doesn't even sound like me in the transcript. It's been so many years ago. Like I said, I done been through too much to remember a conversation from last year, to let alone six, seven years ago."

¶ 88                                    H. Brewer's Testimony

¶ 89          The defense called Brewer, who testified that on August 7, 2026, he was present at the District shooting and that he was shot in that incident. He recounted that, before the shooting, he was in a club, where he encountered some men from Chicago, Illinois, with whom he was on bad terms. They got into an altercation at the club, the police broke up the altercation, and Brewer went to his car. As Brewer was sitting in his car, defendant, a longtime acquaintance of his, walked up, and they chatted for a while and exchanged telephone numbers. About 20 minutes after defendant walked away, the shooting began. Shots rang out, and Brewer woke up in the hospital: he had been shot in the head. Brewer denied seeing defendant with a weapon that night. He did not think that defendant was the one who had shot him.

¶ 90                                        I. The Verdicts

¶ 91          The jury found defendant guilty of the first degree murder of Smith and the aggravated battery of Golden.

¶ 92                        J. Posttrial Proceedings and Sentencing

¶ 93          Defendant retained a different attorney, who filed a motion for a new trial, to supersede the motion for a new trial that the former defense counsel had filed. One of the claims in the new motion was that the circuit court had erred by admitting the eavesdropping recordings and the evidence of other crimes. Another claim was that the former defense counsel had rendered ineffective assistance by failing to move for the exclusion of the recordings on the ground of incompleteness. The court denied the motion for a new trial.

¶ 94                                        II. ANALYSIS

¶ 95                                    A. Deficient Performance

¶ 96        Under the sixth amendment to the Constitution (U.S. Const., amend. VI), a criminal defendant has the right to counsel. This right to counsel includes the right to effective representation by counsel or, in other words, adequate or competent representation. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *People v. Boose*, 2025 IL App (4th) 231467, ¶ 30; *People v. Olsen*, 2023 IL App (4th) 220738-U, ¶ 32.

¶ 97        Defendant claims that defense counsel rendered ineffective assistance at trial by failing to make the following objections to the audio files in People's exhibit No. 42: (1) the lack of a foundation and (2) the impossibility of ensuring compliance with (a) the doctrine of completeness and (b) *Brady*.

¶ 98        "The remedy for a valid claim of ineffective assistance of counsel should be tailored to the injury from the constitutional violation and should not unnecessarily infringe on competing interests." *People v. Patrick*, 2011 IL 111666, ¶ 35. The remedy that defendant seeks is a new trial, a recognized remedy for ineffective assistance (see *id.*).

¶ 99        To obtain that remedy, defendant must carry his burden of showing ineffective assistance. See *People v. Haynes*, 2024 IL 129795, ¶ 37. Specifically, he must establish two propositions: first, "the identified acts or omissions" by counsel "were outside the wide range of professionally competent assistance" (*Strickland*, 466 U.S. at 690), and second, the professionally unreasonable performance caused prejudice to the defense (see *id.* at 693). Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 100        Because it is undisputed that defense counsel did not object to People's exhibit No. 42 on the grounds that defendant argues he should have objected to it, there is no factual

dispute in that respect, and we decide *de novo* whether defendant has shown the two elements of deficient performance and resulting prejudice. See *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). We take up the first ground of objection that, according to defendant, defense counsel unreasonably passed by: the State's failure to lay a foundation for the admission of People's exhibit No. 42.

¶ 101                    1. *Failure to Object to the Lack of a Foundation*

¶ 102          "Laying a foundation" means presenting "evidence or testimony that establishes the admissibility of other evidence." Black's Law Dictionary (12th ed. 2024) (foundation). "[T]he proponent of evidence bears the burden of proving the necessary elements for admissibility." *People v. Torres*, 2012 IL 111302, ¶ 53. For a document to be admitted into evidence, for example, "[e]vidence must be presented to demonstrate that the document is what its proponent claims it to be." *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 42 (2000); see *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 349 (2010); Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). The same is true of a recording: to be admissible, it must first be proven to be authentic. See *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 112.

¶ 103          Illinois case law recognizes two ways to authenticate, or lay a foundation for, an audio recording. First, there is the traditional method of authentication. See *People v. Martin*, 2024 IL App (4th) 231154-U, ¶ 116. "Generally, an audio recording is authenticated when a participant to the conversation or a person who heard the conversation while it was taking place identifies the voices of the people in the conversation and testifies that the recording accurately portrays the conversation." *Daniel*, 2022 IL App (1st) 182604, ¶ 112; see *Martin*, 2024 IL App (4th) 231154-U, ¶ 116. Although Girskis testified that he recognized the voices of defendant and

- 26 -

White in the recorded conversations from the FBI, he did not testify he had participated in those conversations or that he heard the conversations while they were taking place (see *Daniel*, 2022 IL App (1st) 182604, ¶ 112). Thus, Girskis was unable to authenticate the audio recordings through the traditional method of authentication. See *id.* One of the participants in the recorded conversations, White, likewise was unable to authenticate the recordings through the traditional method, for he could not remember his conversations with defendant and, hence, was incapable of determining whether the recordings accurately portrayed the conversations. See *id.* The other participant in the conversations, defendant, did not testify. Thus, the traditional method of authenticating People's exhibit No. 42 was closed to the State.

¶ 104    Case law recognizes an alternative method of authenticating an audio recording: authentication under the silent witness theory. See *id.* Under this theory,

> "a sufficient foundation may be laid for the admission of an audio recording by evidence regarding (1) the capability of the device for recording, (2) the competency of the operator, (3) the proper operation of the device, (4) the preservation of the recording with no changes, additions, or deletions, and (5) the identification of the speakers." *Id.* ¶ 113.

See *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 50. (Metaphorically, the recording itself serves as the "silent witness." *People v. Zalewski*, 2024 IL App (1st) 221864-U, ¶ 69.) Although Girskis identified the speakers in People's exhibit No. 42, thereby satisfying the fifth item in the list above, he did not testify to the preceding four items in the list. Nor, apparently, could any witness have testified to the fourth item—preservation of the recording with no changes or deletions—for it is undisputed that the recording was scrubbed by the FBI: the FBI deleted the portions of the recording that it regarded as irrelevant to the investigation of Smith's murder.

¶ 105 Granted, the parties disagree on the amount of the scrubbing: the State points to statements by defense counsel and the prosecutor that they received 60 or more hours of audio recordings, while defendant points to testimony by Meiresonne that he received only three recordings, each of which was approximately 30 minutes long. In any event, regardless of *how much* the FBI deleted from the four days, or 96 hours, of continuous recording, it is undisputed that the FBI *made deletions*. Although the precise amount of scrubbing is in dispute, the fact of the scrubbing is undisputed. There was a single, continuous recording from which material was cut. It would have been impossible, then, for any witness to testify (truthfully) to "the preservation of the recording with no changes *** or deletions" (*Daniel*, 2022 IL App (1st) 182604, ¶ 113), and, therefore, the silent witness method of authenticating People's exhibit No. 42 was closed to the State, as well.

¶ 106 Nevertheless, the State maintains that "[t]he recordings were adequately authenticated through multiple sources of circumstantial evidence." The State quotes *People v. Kent*, 2017 IL App (2d) 140917, ¶ 86, which states: "Authentication of a document may be made by direct or circumstantial evidence."

¶ 107 In *Kent*, however, the question was whether the circuit court had abused its discretion by ruling that a Facebook post had been authenticated. See *id.* ¶ 66. The federal case on which *Kent* relied, *United States v. Vayner*, 769 F.3d 125 (2d Cir. 2014), also involved the authentication of social media (*Kent*, 2017 IL App (2d) 140917, ¶ 90). A social media post is significantly different from an audio recording. In fact, the appellate court remarked in *Kent* that "[t]he authentication of social media poses *unique* issues regarding what is required to make a *prima facie* showing that the matter is what the proponent claims." (Emphasis added and internal quotation marks omitted.) *Id.* ¶ 105. The difficulty in the State's case in *Kent*—a difficulty the

State never overcame—was presenting " 'some basis' on which a reasonable juror could conclude that the post was not just any Internet post but was, in fact, created by [the] defendant or at his direction." *Id.* ¶ 119 (quoting *Vayner*, 769 F.3d at 133). In the present case, the State presented some basis from which a reasonable juror could have concluded that defendant and White had "created" People's exhibit No. 41, in the sense of conversing while, for four days, the hidden eavesdropping device was continuously on. Girskis testified that he recognized the voices of defendant and White in the audio files from the FBI. The problem is, in the silent witness method of authenticating an audio recording, "the identification of the speakers" is only one element. *Daniel*, 2022 IL App (1st) 182604, ¶ 113. There also are four other elements: "(1) the capability of the device for recording, (2) the competency of the operator, (3) the proper operation of the device, [and] (4) the preservation of the recording with no changes, additions, or deletions." *Id.*

¶ 108    For five reasons, the State argues it proved those elements by circumstantial evidence.

¶ 109    First, the State observes that "the overhear operation was court-authorized and conducted by the FBI." We are aware of no case holding, however, that the *identity* of the operator of the recording device circumstantially authenticates the recording. Nor are we aware of any basis for supposing that every recording device in the FBI's possession was in good working condition and that every FBI agent knew how to operate the recording devices properly. Maybe the numerous UIs in People's exhibit No. 41 are symptomatic of a defect in the recording device or its improper operation or placement. We know for a fact that the operator's identity as the FBI did not prevent "deletions" from being made in the recording (*id.*), for, as the State says in its brief, "[f]ederal agents 'scrubbed' the raw audio for relevance."

¶ 110　　　　　　Second, the State points to White's testimony that "he consented to the overhear recording while in federal custody with defendant." It is indeed arguable that White's consent to the eavesdropping increased the probability that White wanted to elicit reminiscences from defendant and that, therefore, the voices in People's exhibit No. 42 were those of defendant and White as White questioned defendant and he reminisced. Again, though, "the identification of the speakers" is only one element in the authentication of an audio recording. *Id.* It is commonly known that, by the use of artificial intelligence, a real conversation between known speakers that has been digitally recorded can be altered (thus, the importance of having a witness testify, under penalty of perjury, that the recording is unaltered). And, in fact, the FBI did alter the recording by deleting approximately 36 hours of it (96-60=36).

¶ 111　　　　　　Third, the State argues that "[t]he chain of custody was established from the FBI to local law enforcement to the prosecutors to defense counsel." But *was* that chain of custody established? If, as the State represents, the recordings went from the FBI to the Rock Island police and then to the prosecutor and finally to defense counsel, why did the prosecutor and defense counsel possess a greater quantity of recorded material than the lead detective, Meiresonne of the Rock Island Police Department, possessed? Meiresonne testified, "The *** defense and, well, the State was given every recording for that seven-day period. I only had privy to a few of them." If the Rock Island Police Department was a conduit between the FBI and the prosecutor (who, in turn, was a conduit to defense counsel), it is unclear why Meiresonne would be privy to fewer recordings than the prosecutor and defense counsel. Even if we disregarded that conundrum, the purpose of proving a chain of custody is "to render it improbable that the original item has been *** subjected to tampering" (internal quotation marks omitted) (*People v.*

- 30 -

*Flores*, 406 Ill. App. 3d 566, 576 (2010)), but we know that the original item in this case was tampered with: the FBI scrubbed the four-day recording.

¶ 112 Fourth, the State argues, "Sergeant Meiresonne testified that Judge Conway had reviewed the recordings for pertinence before their disclosure." Nevertheless, the State fails to explain how this review of the recordings by Judge Conway enhanced their authenticity. It is unclear what one thing has to do with the other.

¶ 113 Fifth, the State contends that "the recordings' content demonstrated their authenticity through internal consistency with other trial evidence." Such consistency, however, could be, at least in part, a result of the deletions. Excluded material might contradict the State's theory of the case. Because of the deletions, People's exhibit No. 42 might be misleading, a falsification, a distortion, an *inauthentic* version of defendant and White's conversations.

¶ 114 This is not to suggest that the State was obliged to have the jury listen to the entire recording, which was four days long (or seven days long, depending on which account by Meiresonne one goes with). Only the relevant excerpts could have been played for the jury. The entire recording, however, which was a single, continuous, four-day recording, had to be authenticated and admitted into evidence. Why? Because there was a line of appellate court cases going back to 1980 holding that the lack of "changes, additions, or deletions" was a foundational requirement for audio recordings if the silent witness method of authentication was used. See, *e.g.*, *People v. Howard*, 2022 IL App (2d) 190468-U, ¶ 78; *People v. Smith*, 321 Ill. App. 3d 669, 675 (2001); *People ex rel. City of Leland Grove v. City of Springfield*, 193 Ill. App. 3d 1022, 1041 (1990); *People v. Estrada*, 91 Ill. App. 3d 228, 238 (1980).

¶ 115 It was undisputed that People's exhibit No. 42 was the product of scrubbing. Therefore, to keep that exhibit out of evidence, all defense counsel had to do was object on the

ground of a lack of foundation. People's exhibit No. 42 was devastating to the defense, with no upside. There was no imaginable benefit to the defense in the jury's hearing defendant tell White, for example, about the bodies he had heaped up on his cherished Glock .9-millimeter pistol or about his intention to shoot Smith and shoot up his living quarters. Admission of the audio excerpts that the FBI had deigned to share with the State offered no compensating advantage to the defense. Not objecting on the ground of a lack of foundation was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

¶ 116          2. *Failure to Object on the Ground of Noncompliance With Discovery*

¶ 117          The State understands defendant as arguing that "the People violated *Brady* by failing to disclose complete raw recordings maintained by federal authorities." The State violates *Brady* if "(1) the undisclosed evidence is favorable to the defendant because it is exculpatory or impeaches the State's evidence; (2) the State suppressed the evidence, whether willfully or inadvertently; and[ ] (3) the defendant was prejudiced because the evidence was material." *People v. Ewing*, 2026 IL App (1st) 172983-U, ¶ 105. "[T]he burden of establishing a *Brady* violation is on the defendant." *People v. Goldsmith*, 259 Ill. App. 3d 878, 888 (1994). The State maintains that defendant has failed to carry that burden because he has not proven that the FBI retained any evidence favorable to him. The State quotes *United States v. Agurs*, 427 U.S. 97, 109-10 (1976), which states: "The mere possibility that an item of undisclosed information might have helped the defense *** does not establish 'materiality' in the constitutional sense."

¶ 118          The State further contends that defendant's claim of a violation of the completeness doctrine likewise is speculative. Illinois Rule of Evidence 106 (eff. Jan. 1, 2011) provides, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or

recorded statement which ought in fairness to be considered contemporaneously with it." For the presentation of People's exhibit No. 42 to have been fair, what other information in the undisclosed part of the recording should have been presented to the jury? Defendant does not specify. Defendant claims a violation of the completeness doctrine, the State argues, without carrying his burden of proving a violation.

¶ 119     It is true that, in his brief, defendant refers to the State's "inability to satisfy the doctrine of completeness" and its "inability to satisfy *Brady*." Such language, regarded in isolation, might be understood as an attempt to shift the burden of proof from defendant to the State. If, however, his argument is regarded as a whole, what defendant claims is this (to quote another part of his brief): "The State effectively 'outsourced' the gathering of evidence in a way that allowed it to sidestep discovery, *Brady*, and completeness issues." Defendant criticizes defense counsel for failing to object to People's exhibit No. 42 on the basis of "discovery rules." Specifically, defendant cites Illinois Supreme Court Rule 412(f) (eff. Mar. 1, 2001).

¶ 120     Paragraph (f) of that rule is best understood in the context of paragraph (a)(ii):

"(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:

***

(ii) any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements[.]

* * *

- 33 -

(f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." Ill. S. Ct. R. 412(a)(ii), (f) (eff. Mar. 1, 2001).

¶ 121    "[A]ny *** recorded statements *** of *any* oral statements made by the accused" are categorically "relevant to the accused and the offense charged" because subsection (a)(ii) effectively says so: "the State *shall*, upon written motion of defense counsel, disclose to defense counsel" "any" such recorded statements. (Emphases added.) *Id.* Defendant has the right to examine such recorded statements, in their entirety, and to determine *for himself*, with the assistance of defense counsel, whether the statements contain exculpatory material and whether, pursuant to the doctrine of completeness, other parts of the statements should be presented to the jury besides the parts the State presents. Under Rule 412(a)(ii), defendant should not be required to rely on the police—or, for that matter, on a judge—to screen his recorded statements for pertinent information. Accordingly, on June 19, 2018, in his "Pretrial Discovery Motion," defendant requested "[a]ny written or recorded statements and the substance of any oral statement made by the accused."

¶ 122    It is true that, under Rule 412(a), the State is required, "upon written motion of defense counsel" to "disclose to defense counsel" only "material and information within its possession or control." Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001). The four-day recording from the eavesdropping device was within the FBI's possession or control, and the FBI refused to provide the entire recording to the State. The State notes, "[T]he defense admits receiving everything the People possessed." Even so, under Rule 412(f), the State had a duty to "ensure that a flow of information [was] maintained between the various investigative personnel and its office

- 34 -

sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." Ill S. Ct. R. 412(f) (eff. Mar. 1, 2001). Defendant argues:

> "When the State of Illinois chose to have the federal government gather evidence to be used in a State prosecution, the State became responsible for maintaining access to the evidence that was gathered so that it could satisfy its discovery and *Brady* obligations. [Citation.] But the State off-loaded that responsibility to the federal agents, who were beyond the apparent jurisdiction of the court."

In other words, while the State was required, under Rule 412(a), to disclose only material and information that was within its possession and control, Rule 412(f) forbade the State to make an end run around Rule 412(a) by arranging that discoverable material and information would remain beyond its possession and control—such as by acquiescing or agreeing to an investigatory plan that would place discoverable material and information beyond its possession and control. As Rule 412(f) provided, the State had a duty to "*ensure* that a flow of information [was] maintained between the various investigative personnel," such as FBI agents, "and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." (Emphasis added.) *Id.* Defendant argues that (1) the State violated its duty to ensure an unimpeded flow of information from the FBI to the State and (2) defense counsel should have moved for the exclusion of People's exhibit No. 42 on this ground because of the State's noncompliance with discovery.

¶ 123        This seems to be a good argument. We are aware of no reason why the FBI, as opposed to the Rock Island Police Department, *had* to be the agency applying for the eavesdropping warrant if, in the preparatory discussions, the FBI expressed an unwillingness to share the complete recording that would result from the proposed eavesdropping—that is, if

scrubbing was understood to be part of the deal. The circuit court was concerned that the scrubbing would prevent the parties from confirming compliance with *Brady*. The court remarked, "[W]e had a lot of these types of situations where the FBI conducts an overhear, reviews the material on their own, decides what is relevant and what's not relevant. I don't know if they take *Brady* material into account or not." The prosecutor responded, "I certainly do have from experience faith that the federal authorities know what *Brady* material is and their obligations related to it." The court retorted, "The Court's concern is usually the final adjudicator of that issue isn't one of the parties, it's the Court." The prosecutor acknowledged that the court had a point. The court continued, "I have no way to adjudicate that issue."

¶ 124    But the circuit court would have had a way to adjudicate that issue if defense counsel had moved for the exclusion of People's exhibit No. 42 as a discovery sanction under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 23, 2020). That rule provides as follows:

> "(i) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, *exclude such evidence*, or enter such other order as it deems just under the circumstances." (Emphasis added.) *Id.*

Given the concern the court repeatedly expressed about compliance with *Brady* ("I sure hope there is no *Brady* material on there."), such a motion would have had a reasonable probability of success. It was "outside the wide range of professionally competent assistance" not to make such a motion. *Strickland*, 466 U.S. at 690. Arguably, if the State entered into an agreement whereby it would receive only partial access to a statement that the State otherwise would have had to

disclose to the defendant in its entirety and if, apparently, by alternative arrangements, the State could have obtained the full statement without limitation, the State should be barred from using the fragmentary statement against the defendant at trial.

¶ 125                                     B. Prejudice

¶ 126        For a claim of ineffective assistance, deficient performance is not enough; the deficient performance must have caused prejudice to the defense. See *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996). We find an infliction of prejudice, for, although the State adduced other evidence against defendant besides the recordings, this other evidence had vulnerabilities.

¶ 127        When we exclude People's exhibit No. 42 from consideration, we are left with the evidence that empty cartridge cases at the scene of Smith's murder and at the scene of the District shooting came from the .9-millimeter Glock pistol that the police found in the back seat of the Pontiac that was left at the scene of the Davenport shooting. After the Davenport shooting, defendant went to the hospital in Davenport to receive treatment for gunshot wounds. Also, the police found his palm print on the rearview mirror of the Pontiac.

¶ 128        There is some discrepancy in the evidence as to whether this mirror was inside the Pontiac or outside. On the one hand, a Davenport police officer, Stegall, testified he had lifted a potentially comparable print from the "left exterior rearview mirror." On the other hand, Alderson, the criminalist who identified defendant's right palm print in People's exhibit No. 18, testified that the corresponding print lift card was labeled "simply" " [']rear-view mirror,['] " and he pointed out that a rearview mirror was, by definition, "inside of the car."

¶ 129        Alderson was right about the meaning of "rearview mirror": it is "a mirror (as *in* an automobile) that gives the driver a view of the area behind a vehicle" (emphasis added) (Merriam-Webster's New Collegiate Dictionary 1036 (11th ed. 2020)), whereas a "side-view

mirror" is "a mirror on the *outside* of a vehicle that allows the driver to see what is behind and to the right or left of the vehicle" (emphasis added) (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/side-view%20 mirror (last visited Apr. 8, 2026). To a trier of fact, this distinction between inside and outside might matter because a passerby might leave a palm print on the side-view mirror of a car, but it is difficult to visualize how the right palm print of anyone other than the driver would end up on the rearview mirror, properly speaking. If defendant was the driver of the Pontiac, then, arguably, he had constructive possession of the Glock .9-millimeter pistol that was lying, in plain sight, on the back seat. See *People v. Hunter*, 2013 IL 114100, ¶ 19 ("Constructive possession exists where there is no actual, personal, present dominion over contraband, but [the] defendant had knowledge of the presence of the contraband, and had control over the area where the contraband was found. The doctrine of constructive possession has been applied to cannabis and weapons collectively as contraband."). The trouble is, such a theory of constructive possession in this case would depend on whether, when Stegall wrote "rear-view mirror" on the print lift card, he used that term in its correct lexical sense as the interior mirror or, alternatively, whether he meant the left side-view mirror, the mirror from which, according to his testimony, he had lifted a potentially comparable print. The State endorses Stegall's testimony. The State says that "[d]efendant's palm print was found on the *exterior* rearview mirror of the vehicle in which the murder weapon was recovered following the Davenport shooting." (Emphasis added.) Assuming, as the State says, that "defendant's own palm print [was] found on the exterior of that same vehicle," we do not know when he placed his palm print on the exterior of the vehicle, and he would not necessarily have done so as the driver. Although defendant was shot on the night of the Davenport shooting, it

does not necessarily follow (in the absence of the recordings) that he was shot at that shooting or that he wielded the .9-millimeter Glock pistol found in the Pontiac.

¶ 130 White's testimony against defendant could likewise be problematized. Although White testified that defendant had told him he had shot Smith, White could not remember the conversation in which defendant made this, one would think, momentous and, therefore, memorable disclosure.

¶ 131 So, without the audio excerpts in People's exhibit No. 42, the State had some evidence against defendant, but the evidence could have been reasonably questioned. It could have been called into doubt. People's exhibit No. 42 made the State's evidence overwhelming: it supplied defendant's motive for murdering Smith, his stated intent to shoot him, his ownership and repeated use of the murder weapon, and his participation in the District shooting, where empty cartridge cases from the same murder weapon were found. Therefore, we find prejudice from defense counsel's failure to make a meritorious objection to People's exhibit No. 42 on the grounds of a lack of foundation and noncompliance with discovery. See *Strickland*, 466 U.S. at 693.

¶ 132 Our acceptance of this claim of ineffective assistance is enough to resolve the appeal. The supreme court has cautioned us "that courts of review should not ordinarily consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided." *People v. White*, 2011 IL 109689, ¶ 144. In other words, "we should decide only what we have to decide" to reach a disposition. *People v. Manskey*, 2016 IL App (4th) 140440, ¶ 87. By concluding that the failure to make a twofold objection to People's exhibit No. 42 was ineffective assistance, entitling defendant to a new trial,

we have effectively disposed of this appeal. We need not reach the remaining three issues that defendant raises.

¶ 133     It is unfortunate, though, that, in its admonitions to the prospective jurors, the circuit court characterized as a "failure" defendant's choice not to testify (if, as it turned out, he so chose). "Failure" is a pejorative term, and no hint of criticism should be made against a defendant's exercise of the right to remain silent (see *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 90). Under the current version of Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the court is to "ask each potential juror, individually or in a group, whether that juror understands and accepts *** that if a defendant does not testify[,] it cannot be held against him or her." We mention this only because it may become an issue on remand for a new trial.

¶ 134                    III. CONCLUSION

¶ 135     For the reasons stated, we reverse the circuit court's judgment and remand this case for a new trial.

¶ 136     Reversed and remanded.